In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2305

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BRANNON L. HATCHETT,

Defendant-Appellant.


Appeal from the United States District Court
for the Western District of Wisconsin.
No. 98 CR 117--John C. Shabaz, Chief Judge.


Argued December 7, 1999--Decided March 26, 2001


   Before HARLINGTON WOOD, JR., RIPPLE, and ROVNER,
Circuit Judges.

   ROVNER, Circuit Judge. A jury convicted Brannon
L. Hatchett of distributing crack cocaine and of
aiding and abetting his purchaser's re-sale of
the same cocaine to an informant and an
undercover officer. Hatchett contends that his
concurrent sentence on the aiding and abetting
charge amounts to a second punishment for the
same offense. He also challenges the admission of
evidence concerning a prior narcotics
transaction, as well as the district court's
refusal to admit certain fingerprint evidence. We
conclude that Hatchett's conviction and sentence
on the aiding and abetting charge do not amount
to an impermissible multiple punishment for a
single offense. We also find no abuse of
discretion in the admission of testimony
concerning the prior drug transaction or in the
exclusion of the fingerprint evidence.

I.

   In reviewing Hatchett's conviction, we are
obligated to credit testimony and indulge
inferences that benefit the prosecution. We
therefore recount the facts in the light most
favorable to the government.

   Hatchett met John L. Riley at a Madison,
Wisconsin nightclub in October of 1998, and

shortly thereafter Hatchett began to sell crack cocaine to Riley. Typically, when Riley wanted to make a purchase, he would contact Hatchett either by paging him or by telephoning him at the apartment of Hatchett's girlfriend, where Hatchett often stayed.

In November 1998, Tracy Panzer, whose brother was married to Riley's sister, telephoned Riley to ask whether he could obtain an ounce of crack cocaine for himself and a friend. Unbeknownst to Riley, Panzer was working as a confidential informant with the Oneida County Sheriff's Department, and his "friend," Dan Hess, was a deputy sheriff working undercover. After a number of telephone calls to Hatchett, Riley told Panzer that he had the cocaine Panzer and his friend wanted.

On November 24, 1998, Riley met Panzer and Hess at a PDQ near Riley's apartment in Madison. Riley did not have the cocaine with him at that time, and explained to Panzer and Hess that he needed to telephone his "guy" in order to get it. Riley borrowed Hess's cellular phone for that purpose and placed a call to the home of Hatchett's girlfriend. After completing the call, Hatchett told the two men that they would have to wait awhile in order to complete the transaction. Panzer and Hess then drove Riley to his apartment complex. Riley invited them in to his apartment to wait for his source to deliver the cocaine. The two men declined, however, and Hess went up to this second-floor apartment alone. There he contacted Hatchett, arranged for delivery of the cocaine, and then telephoned Panzer and Hess to let them know that the narcotic was on its way.

A surveillance officer subsequently observed a car drive into the parking lot of the apartment complex, circle the lot, and then leave. Moments later Hatchett telephoned Riley and said that he thought there was "heat" in the vicinity of the apartment building. Riley assured him that everything was fine and encouraged him to come to his apartment. A short time later the same car that had circled and left the parking lot earlier returned and parked. A man later identified as Hatchett left the vehicle and entered Riley's apartment building. No more than two minutes later, Riley telephoned Panzer and Hess to tell them that he had the cocaine and to name the price ($775) that he wanted. Panzer and Hess, who were waiting at a local shopping mall, drove back to Riley's apartment complex. While they were en route, Riley left Hatchett in his apartment awaiting payment and walked downstairs to the building entryway. He stopped there to collect his mail and to look outside in order to determine whether there might be any "heat" in

the parking lot, as Hatchett had suspected. He satisfied himself that there was none. Impatient for Panzer and Hess to arrive, Riley telephoned them again wondering where they were. They assured him that they were on their way. In fact, they arrived almost immediately, parked in front of the apartment building, and spotted Riley waiting for them in the doorway. Riley walked over to Panzer's car, got in the back seat, and handed to Hess a Marlboro cigarette package containing a substance that was later determined to be nearly 10 grams of crack cocaine.

Once Riley had delivered the cocaine, an arrest signal was given and officers moved in to arrest Riley. As they did so, Hess saw Hatchett standing on Riley's second-floor balcony. Hatchett, who was ordered to remain where he was, tried to flee but was unsuccessful.

A grand jury indicted Hatchett on two charges. R. 11. As elucidated by the government's subsequent bill of particulars (R. 31 at 2-3), Count One alleged that Hatchett knowingly and intentionally distributed crack cocaine to Riley, in violation of 21 U.S.C. sec. 841(a)(1), while Count Two alleged that he aided and abetted Riley's subsequent delivery of that same cocaine to Hess, in violation of 18 U.S.C. sec. 2 and 21 U.S.C. sec. 841(a)(1). Before trial, Hatchett moved to dismiss Count Two as multiplicitous, asserting that the indictment effectively charged him twice for the same crime. R. 22, 32. On the recommendation of the magistrate judge (R. 41), the district court denied the motion (R. 52). The court emphasized that the indictment charged Hatchett with participating in two distinct criminal transactions, his own initial distribution of cocaine to Riley, and Riley's subsequent distribution of the cocaine to Hess. In order to prove Hatchett's guilt on Count Two, the court pointed out, the government would have to establish that the second distribution from Riley to Hess took place, and that Hatchett knowingly associated himself with that second transaction, that he participated in it, and that he tried to make it succeed. R. 41 at 7, R. 52 at 3. Therefore, the court reasoned, the indictment did not charge Hatchett twice for the same offense.

The case proceeded to trial. Hatchett's defense was that he was not Riley's source of cocaine. Riley was a goldsmith, and Hatchett maintained that he associated with Riley solely because he believed he might be able to get jewelry at a discounted price. Indeed, Hatchett had introduced his cousin to Riley, and according to the defense, Riley was in the process of making some jewelry for his cousin in late November 1998.

That was Hatchett's explanation for his presence in Riley's apartment on the evening of November 24, when he and Riley were arrested. (The police found no narcotics, no large sums of cash, and no drug paraphernalia either on Riley's person or in his car.)

It turned out, however that there had been a prior cocaine transaction that brought Hatchett, Riley, and Tracy Panzer's brother Robert together. In late October, 1998 (one month prior to the events culminating in Hatchett's indictment), Riley had mentioned to Robert that he had a new source for crack cocaine. Robert expressed interest in obtaining some of the illicit drug from Riley's source and asked Riley to make appropriate arrangements. Robert drove to Riley's apartment in Madison in order to retrieve the cocaine. After he arrived, Riley made a number of telephone calls to his source. After a three-hour wait, Hatchett arrived at Riley's apartment. After Robert was introduced to Hatchett and the two had shaken hands, Riley and Hatchett went into a bathroom together. When they emerged, Riley turned over an "eight-ball" quantity of crack cocaine to Robert and kept a similar amount for himself. Hatchett then left the apartment. Over Hatchett's objection, the district court permitted the government to elicit testimony from Robert about this October transaction, reasoning that the evidence was admissible under Fed. R. Evid. 404(b) in order to establish plan or preparation, knowledge, and opportunity. R. 79 at 14-19.

At the close of the defense case, Hatchett's counsel offered an uncertified copy of a fingerprint analysis report issued by the Wisconsin Crime Laboratory. R. 80 at 268. That report indicated that the laboratory was unable to match to either Riley or Hatchett a latent fingerprint found on a metal cigar box in which Hatchett had delivered the cocaine to Riley on November 24. Def. Ex. 4. Judge Shabaz declined to admit the report into evidence without an appropriate foundation. R. 80 at 269-72.

The jury convicted Hatchett on both counts of the indictment. Judge Shabaz ordered him to serve a prison term of 90 months, to be followed by a five-year term of supervised release. The judge did not impose a fine or any restitution obligation, but he did order Hatchett to pay a special assessment of $100 on each count of conviction.

II.
A.

The Double Jeopardy Clause of the Fifth

Amendment provides that no "person [shall] be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V. Three separate guarantees inhere in this constitutional provision: (1) once acquitted of a charge, a person shall not be prosecuted again for the same offense; (2) once convicted of a crime, a person shall not be prosecuted again for that same crime; and (3) one shall not be punished twice for the same offense. E.g., Illinois v. Vitale, 447 U.S. 410, 415, 100 S. Ct. 2260, 2264 (1980). It is the third guarantee, if any, that would potentially apply to Hatchett, to the extent that his sentence reflects multiple punishments for what he argues is one offense./1 The Supreme Court has made clear, however, that the Double Jeopardy Clause proscribes multiple punishments for a single offense only when those punishments are imposed in successive proceedings. Hudson v. United States, 522 U.S. 93, 99, 118 S. Ct. 488, 493 (1997), citing Missouri v. Hunter, 459 U.S. 359, 366, 103 S. Ct. 673, 678 (1983). "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." Hunter, 459 U.S. at 366, 103 S. Ct. at 678; see also Ohio v. Johnson, 467 U.S. 493, 499, 104 S. Ct. 2536, 2540-41 (1984); Whalen v. United States, 445 U.S. 684, 688, 100 S. Ct. 1432, 1436 (1980). The presumption is that the legislature did not intend to impose two punishments for a single offense. Rutledge v. United States, 517 U.S. 292, 297, 116 S. Ct. 1241, 1245 (1996). Of course, the first question a court must answer in any such case is whether indeed the defendant has been punished twice for the same offense.

The two punishments imposed on Hatchett are based on two separate transactions--Hatchett's distribution of crack cocaine to Riley, and Riley's re-distribution of that cocaine to Panzer and Hess. Blockburger v. United States, 284 U.S. 299, 301-02, 52 S. Ct. 180, 181 (1932), leaves no doubt that each successive distribution of a narcotic amounts to a separate offense and, as such, may be punished separately. It was this point on which the district and magistrate judges focused. Both emphasized that Hatchett was not at peril of being punished twice for a single transaction. His prospective liability on the two charges instead sprang from his alleged participation as the distributor of crack cocaine to Riley in the first instance, and as an aider and abettor of Riley's subsequent distribution to Panzer and Hess. R. 52 at 2-3; R. 41 at 7-8.

Yet, as we shall see, Hatchett's asserted liability as an aider and abetter of the second

of these transactions-- Riley's distribution of the cocaine to Panzer and Hess-- depends largely on proof that Hatchett supplied Riley with the cocaine. Consequently, the fact that there were two transactions in this case does not resolve the multiple-punishments question. See Brown v. Ohio, 432 U.S. 161, 169, 97 S. Ct. 2221, 2227 (1977) ("The Double Jeopardy Clause is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of dividing a single crime into a series of temporal or spatial units."). We must consider whether Hatchett actually committed two separate offenses by engaging in one act or transaction--the sale of cocaine to Riley. In so doing, we shall look to cases that deal with multiple prosecutions as well as multiple punishments, as both proceed under the same analytical framework. See United States v. Dixon, 509 U.S. 688, 696, 113 S. Ct. 2849, 2856 (1993).

Dixon informs us that in deciding whether two offenses are the same or not, our inquiry must focus on the elements of each of the charged offenses rather than the underlying conduct. Dixon re-established the "same elements" test articulated by Blockburger as the one and only test that courts are to apply in considering whether a defendant may be prosecuted or punished twice based on a single act or transaction. Id. at 703-12, 113 S. Ct. at 2859-64; see Blockburger, 284 U.S. at 304, 52 S. Ct. at 182. Blockburger framed the inquiry as follows:

The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact that the other does not.

284 U.S. at 304, 52 S. Ct. at 182. Grady v. Corbin, 495 U.S. 508, 521-22, 110 S. Ct. 2084, 2093 (1990), had added a second inquiry to the analysis that turned on the conduct underlying the two offenses as opposed to the elements of each crime. Dixon, however, overruled Grady, leaving Blockburger's "same elements" test as the definitive standard. See 509 U.S. at 711-12, 113 S. Ct. at 2864. (We shall have more to say about Grady as well as Dixon below.)

The elements of the two crimes at issue here are, of course, distinct. In order to prove Hatchett guilty of distributing cocaine base in violation of 21 U.S.C. sec. 841(a)(1), the government was required to show that Hatchett distributed the crack cocaine to Riley, that he did so knowingly and intentionally, and that he

knew he was distributing a controlled substance. E.g., United States v. Clarke, 227 F.3d 874, 882 (7th Cir. 2000), cert. denied, 121 S. Ct. 1165 (2001). By contrast, in order to prove Hatchett guilty of aiding and abetting Riley's distribution of cocaine base, in violation of 18 U.S.C. sec. 2 and 21 U.S.C. sec. 841(a)(1), the government was required to show that (1) Riley distributed crack cocaine, that he did so knowingly and intentionally, and that he knew he was distributing a controlled substance, and in addition that (2) Hatchett knowingly associated himself with Riley's delivery, that Hatchett participated in that delivery, and that he tried to make it succeed. See, e.g., United States v. Johnson, 127 F.3d 625, 628 (7th Cir. 1997); see also United States v. Valencia, 907 F.2d 671, 680 (7th Cir. 1990). Each offense obviously includes an element that the other does not: The first charge has nothing whatsoever to do with Riley's re-distribution of the cocaine to Panzer and Hess; and the second charge, which is focused on Riley's re-distribution, facially would seem not to depend on proof that Hatchett distributed the cocaine to Riley. Indeed, in the abstract, it is easy to see how Hatchett could be found guilty on one crime but not the other. If Riley had done nothing at all with the cocaine that Hatchett sold to him, for example, Hatchett would still be guilty of distributing the cocaine. And Hatchett could have aided and abetted Riley's distribution of the cocaine to Panzer and Hess in a variety of ways other than by supplying the cocaine to Riley.

However, putting theoretical possibilities aside to focus on the facts of this case, it is clear that Hatchett could not have been convicted on the aiding and abetting charge in the absence of proof that he knowingly and intentionally distributed the cocaine to Riley. Hatchett did nothing to further Riley's transaction with Panzer and Hess apart from supplying Riley with the cocaine. The government's theory of the case was that Hatchett was not indifferent to the reasons for which Riley was purchasing the cocaine from him, and instead delivered the cocaine to Riley specifically for re-sale, with the understanding that Riley would pay him for the cocaine after Riley himself received payment from his customers. See R. 31 at 4, R. 81 at 37. Thus, although Count One of the indictment-- Hatchett's distribution to Riley--stood on its own, the aiding and abetting charge set forth in Count Two did not. Indeed, the government conceded at argument that even if Hatchett had been indicted only for aiding and abetting Riley's sale, it still would have been required to prove that Hatchett delivered the cocaine to Riley.

Where proof of one offense necessarily entails proof that another offense occurred, rendering the latter a lesser included offense of the former, the two offenses are deemed to be the "same" for purposes of Blockburger. See Rutledge, 517 U.S. at 297, 116 S. Ct. at 1245; Brown, 432 U.S. at 168-69, 97 S. Ct. at 2227. In such cases, the greater of the two offenses will, as Blockburger demands, require proof of an extra element not found in the other offense. But the lesser offense, by contrast, will require no proof other than that which is called for to convict on the greater charge. See United States v. 9844 S. Titan Court, Unit 9, Littleton, Col., 75 F.3d 1470, 1489 (10th Cir. 1996), overruled in part on other grounds by United States v. Ursery, 518 U.S. 267, 116 S. Ct. 2135 (1996); see also Brown, 432 U.S. at 168, 97 S. Ct. at 2226-27. "The greater offense is therefore by definition the 'same' for purposes of double jeopardy as any lesser offense included in it." Ibid. See, e.g., Rutledge, 517 U.S. at 300, 116 S. Ct. at 1247 (because conspiring to distribute a controlled substance amounts to a lesser included offense of conducting a continuing criminal enterprise in concert with others, the two are not genuinely separate crimes that may be punished separately); Whalen v. United States, supra, 445 U.S. at 694, 100 S. Ct. at 1439 (rape and killing in the course of a rape are not separate offenses, where proof of the rape amounts to a necessary element of the felony murder charge); Brown, 432 U.S. at 168, 97 S. Ct. 2226-27 (joyriding and auto theft are not separate offenses, where the lesser offense of joyriding requires no proof beyond what is required to prove auto theft).

In a factual sense, one could view the distribution charge against Hatchett as a lesser included offense of the aiding and abetting charge. It was by supplying Riley with crack cocaine that Hatchett was said to have aided and abetted Riley's distribution of the cocaine to Panzer and Hess. Consequently, in order to prove Hatchett guilty on the aiding and abetting charge, the government inevitably had to establish each of the elements necessary to convict Hatchett on the distribution charge. Obviously, it had to prove that Hatchett distributed a controlled substance to Riley, for without that delivery, Riley would have been unable to make the sale to Panzer and Hess. The government also had to show that the transfer from Hatchett to Riley was knowing and intentional in order to prove that Hatchett knowingly assisted Riley's distribution of the cocaine to his customers. For the same reason, the government was required to show that Hatchett realized he was delivering a controlled

substance, for if Hatchett was ignorant of that fact, he could not have knowingly aided Riley's re-distribution of the cocaine.

However, there is one readily apparent respect in which the relationship between the two charges at issue in this case differs from the lesser-included-offense status that courts have cited in other cases. Distribution of a controlled substance obviously is not always a lesser included offense of aiding and abetting the distribution of a controlled substance. One can aid and abet a narcotics transaction in myriad ways other than by supplying the controlled substance. Cf. Illinois v. Vitale, supra, 447 U.S. at 419-20, 100 S. Ct. at 2267 ("If, as a matter of Illinois law, a careless failure to slow is always a necessary element of manslaughter by automobile, then the two offenses are the 'same' under Blockburger and Vitale's trial on the latter charge would constitute double jeopardy under Brown v. Ohio.") (emphasis supplied). It simply happens to be the case here that the government could not convict Hatchett on the aiding and abetting charge without establishing each of the elements of the companion distribution charge.

Precedent does make clear that one offense need not invariably be a lesser included offense of another in order for the two to be deemed the same offense. In Harris v. Oklahoma, 433 U.S. 682, 97 S. Ct. 2912 (1977) (per curiam), the petitioner and his accomplice had robbed a grocery store, and in the course of the robbery the accomplice shot and killed a store clerk. The petitioner was first tried and convicted of felony murder, with the State citing armed robbery as the underlying felony. Subsequently he was tried and convicted for the robbery itself. A unanimous Supreme Court vacated the second conviction: "When, as here, conviction of a greater crime, murder, cannot be had without conviction of the lesser crime, robbery with firearms, the Double Jeopardy Clause bars prosecution for the lesser crime, after conviction of the greater one." Id. at 682, 97 S. Ct. at 2913. Although the Supreme Court did not expressly acknowledge the point, it was nonetheless clear from the state court's opinion that a felony murder charge could have been predicated on a number of felonies other than armed robbery, see Harris v. State, 555 P.2d 76, 80 (Ok. Crim. App. 1976), and consequently that robbery was not per se a lesser included offense in relation to felony murder.

Three years later, in Vitale, the Court acknowledged the obvious implication of Harris-- that one offense need not always constitute a

lesser included offense of another in order to raise the double jeopardy bar, but that it may be recognized as such within the confines of an individual case.

The Oklahoma felony-murder statute [at issue in Harris] on its face did not require proof of a robbery to establish felony murder; other felonies could underlie a felony-murder prosecution. But for the purposes of the Double Jeopardy Clause, we did not consider the crime generally described as felony murder as a separate offense distinct from its various elements. Rather, we treated a killing in the course of a robbery as itself a separate statutory offense, and the robbery as a species of lesser-included offense.

447 U.S. at 420, 100 S. Ct. at 2267 (footnote omitted).

The Supreme Court's more recent handling of Dixon, although it produced no majority opinion, confirms this point. In Dixon, the two respondents had been convicted of criminal contempt. One of the respondents, Dixon, by possessing cocaine with the intent to distribute, had violated a pre-trial release order issued in an unrelated case that prohibited him from committing "any criminal offense," and the other, Foster, by assaulting and threatening his estranged wife, had violated a civil protection order that required him not to "molest, assault, or in any manner threaten or physically abuse" her. Both were convicted of criminal contempt of court. The question presented to the Court was whether the contempt convictions prevented the government from later trying the men for the underlying acts of cocaine possession, assault, and threats to injure another. Most of the Court's members agreed that Grady v. Corbin would bar the later prosecutions, as they implicated the same conduct on which the contempt convictions were based. See 509 U.S. at 703-04, 113 S. Ct. at 2859-60 (majority); id. at 761-63, 113 S. Ct. at 2890-91 (Souter, J., concurring in the judgment in part and dissenting in part)./2 Yet, as we have noted, a majority of the justices elected to jettison Grady's "same conduct" test, leaving the "same elements" approach of Blockburger as the governing framework. Id. at 704-12, 113 S. Ct. at 2860-64. When they considered the extent to which the elements of contempt of court were distinct from the elements of the other offenses with which the respondents were charged, seven of the Court's nine members looked to the lesser-included-offense analysis of Harris, Brown v. Ohio, and like cases as the most pertinent authority. See 509 U.S. at 698, 113 S. Ct. at 2857 (opinion of Scalia, J.); id. at 714,

717-19, 113 S. Ct. at 2865, 2867-68 (opinion of Rehnquist, C.J.); id. at 731-32, 113 S. Ct. at 2875 (opinion of White, J.). Although that analysis led these justices to widely disparate conclusions, set forth in three separate opinions, each of those opinions reflects agreement with the proposition the lesser-included-offense analysis is contextual, and that one offense need not amount to a lesser included offense of another in all cases before the two may be treated as the same offense in one case.

Justice Scalia's opinion, joined in its lesser-included-offense analysis only by Justice Kennedy, reflected the judgment of the Court. Justice Scalia emphasized that the relationship between the criminal offenses under scrutiny cannot be assessed in the abstract, wholly divorced from the particular circumstances of the case:

We have described our terse per curiam opinion in Harris as standing for the proposition that, for double jeopardy purposes, "the crime generally described as felony murder" is not "a separate offense distinct from its various elements." Illinois v. Vitale, 447 U.S. 410, 420-421, 100 S. Ct. 2260, 2267, 65 L.Ed.2d 228 (1980). Accord, Whalen v. United States, 445 U.S. 684, 694, 100 S. Ct. 1432, 1439, 63 L.Ed.2d 715 (1980). So too here, the "crime" of violating a condition of release cannot be abstracted from the "element" of the violated condition. The Dixon court order incorporated the entire criminal code in the same manner as the Harris felony-murder statute incorporated the several enumerated felonies. Here, as in Harris, the underlying substantive criminal offense is "a species of lesser-included offense." Vitale, supra, 447 U.S., at 410, 100 S. Ct., at 2267. Accord, Whalen, supra.

509 U.S. at 698, 113 S. Ct. at 2857 (footnote omitted). In other words, because Dixon's pre-trial release order prohibited him from committing any act that constituted a crime under the local criminal code, proof of such a criminal act was, in this context, a necessary element of the contempt charge. Justice Scalia thus concluded that the underlying criminal act--Dixon's narcotics offense--constituted a lesser included offense of the criminal contempt charge and, as such, could not be prosecuted after Dixon had already been convicted and punished for contempt. Id. at 697-98, 113 S. Ct. at 2856-57. Likewise, he concluded that Foster could not be prosecuted for simple assault, because his previous contempt conviction for violating the civil protection order--which, in relevant part, required him not to "assault" his estranged wife--had rested on proof that he had committed an

assault upon her in violation of local law. Id. at 700, 113 S. Ct. at 2858./3 However, Justice Scalia concluded that the other charges subsequently brought against Foster did not constitute lesser included offenses of the contempt charge, because each mandated proof of an element that was not required in order to establish a violation of the civil protection order, and thus it was not necessary to prove each and every element of these offenses in order to prove Foster guilty of contempt. Id. at 700-03, 113 S. Ct. at 2858-59. Assault with intent to kill, obviously, demanded proof of a specific intent to kill, whereas proof of such an intent was wholly unnecessary to establish a violation of the protection order. Id. at 701, 113 S. Ct. at 2858-59. Similarly, criminal threats to kidnap another person, and to injure the person or property of another, required proof of specific types of threats, whereas the protection order-- which required Foster not to "in any manner threaten" his estranged wife--proscribed the entire universe of threats, including threats which might not violate the local criminal code. Id. at 702, 113 S. Ct. at 2859. Proof that Foster had violated the civil protection order thus did not entail proof of each and every element of these offenses, and left the door open to subsequent prosecution. Id. at 702-03 & n.8, 113 S. Ct. at 2859 & n.8

In contrast to Justices Scalia and Kennedy, Chief Justice Rehnquist, joined by Justices O'Connor and Thomas, did not think that Harris's lesser-included-offense analysis barred any of the later charges against Dixon and Foster. He did not quarrel with the notion that a conviction for a greater offense like felony murder would bar subsequent prosecution for any of the myriad felonies that might have served as the predicate for the felony murder charge:

In Harris, we held that a conviction for felony murder based on a killing in the course of an armed robbery foreclosed a subsequent prosecution for robbery with a firearm. Though the felony-murder statute in Harris did not require proof of armed robbery, it did include as an element proof that the defendant was engaged in the commission of some felony. We construed this generic reference to some felony as incorporating the statutory elements of the various felonies upon which a felony-murder conviction could rest.

Id. at 717, 113 S. Ct. at 2867 (emphasis in original). Consequently, notwithstanding the fact that such an offense could be predicated on proof of any number of lesser offenses, the Chief Justice agreed that once a person has been convicted of the greater offense based on proof

of a particular predicate, double jeopardy forbids prosecution for that predicate. See ibid. Where Justice Rehnquist parted ways with Justice Scalia was in identifying the pertinent elements of the two crimes for purposes of the Blockburger inquiry. In the Chief Justice's view, a court must confine its focus to the statutory elements of each offense. Felony murder, for example, is typically defined as a killing committed in the course of one of a number of felonies; proof of the felony thus constitutes an express element of the murder charge. The crime of contempt, by contrast, simply requires proof of an order known to the defendant, and a violation of that order. Proof that the contemnor committed a separate crime is not required. Only by looking beyond the statutory elements of contempt, to the terms of the underlying court orders, could Justice Scalia say that the contempt convictions necessarily entailed proof that Dixon and Foster had committed the criminal acts with which they were later charged. The Chief Justice believed it was inappropriate to define contempt so expansively. See id. at 718-19, 113 S. Ct. at 2867-68.

Justice White, on the other hand, joined in relevant part by Justice Stevens, believed that the lesser-included-offense analysis barred prosecution for all of the crimes for which Dixon and Foster were charged in the wake of their contempt convictions. Like Justice Scalia, Justice White believed that one had to look to the terms of the court orders that the respondents had been found to have violated in order to determine whether their contempt convictions necessarily entailed proof of the later-charged crimes. See id. at 731-32, 113 S. Ct. at 2874-75. He therefore agreed with Justice Scalia that because Dixon's pre-trial release order forbade him in relevant part from committing any act in violation of the local criminal code, the contempt charge against him had necessarily entailed proof that he had committed such a crime. Dixon could not later be prosecuted for possessing a narcotic with the intent to distribute, then, when his contempt conviction had required proof of that very criminal act. Id. at 731-33; 113 S. Ct. at 2874-75. Like Justice Scalia, Justice White also construed the civil protection order entered against Foster to prohibit him from committing the crime of assault. Having already been convicted of contempt based on the commission of an assault upon his estranged wife, Foster thus could not later be charged with the crime of simple assault. Id. at 731-33 & n.7, 113 S. Ct. at 2874-75 & n.7. In contrast to Justice Scalia, however, Justice White believed that a contempt conviction that rested on proof of a simple assault also barred subsequent prosecution for

assault with intent to kill, because simple assault is a lesser included offense of assault with intent to kill. Id. at 732-33 & n.7, 113 S. Ct. at 2875 & n.7. Further, whereas Justice Scalia read the protection order's reference to threats upon Foster's estranged wife as a reference to all types of threats, including those which did not amount to crimes, Justice White construed the order to forbid only threats that violated local law. Consequently, having already been charged and convicted of contempt based in part on such criminal threats, Foster could not later be charged with threatening to kill or injure the person or property of another, because those offenses were either the same as, or subsumed, the types of criminal threats that led to the contempt proceeding. Ibid./4

In sum, these three opinions reflect differences among the Supreme Court's members as to how one should define the elements of the crimes under scrutiny for purposes of the lesser-included-offense analysis. Chief Justice Rehnquist and his contingent, as we have discussed, would look solely to the formal, statutory elements of the offenses to decide whether one offense required proof of another. Justices Scalia and White and their contingents, on the other hand, would look a bit further. Where, for example, the defendant has been convicted of contempt, as the respondents in Dixon were, they would look to the terms of the order that the defendant had disobeyed; and to the extent that order forbade the defendant from committing particular criminal acts, they would treat proof of such acts as an element of the contempt charge. However, although these three camps differed as to how one identifies the pertinent elements of an offense for double jeopardy purposes, all agreed on one important premise: that an offense need not always be a lesser included offense of the other in order for the two to be treated as the "same" offense under Blockburger. If one offense, among many possibilities, serves in a particular case as the predicate for a greater offense like felony murder, then the defendant cannot be prosecuted or punished twice for both offenses, because the greater offense in that case necessarily requires proof of the lesser, and the two are in that sense one crime.

So, the fact that distributing a narcotic does not invariably constitute a lesser included offense of aiding and abetting does not foreclose the possibility that they could be considered the "same" offense for purposes of the double jeopardy analysis. Yet there remains one clear point of distinction that separates this case from both Harris and Dixon. In each of those cases, the greater offense demanded proof that

another criminal offense had occurred. In Harris, the government had to prove that the defendant had committed a felony in order to prove him liable for felony murder. In Dixon, the court orders, either explicitly or implicitly, required the two respondents not to engage in criminal activity, so a conviction for criminal contempt required proof that they had committed one of the proscribed crimes. In each case, a variety of criminal acts might have sufficed as the predicate, but proof of some type of independent crime was necessary to establish the greater offense. Aiding and abetting, by contrast, does not demand, as one of its elements, proof that another crime occurred. See 18 U.S.C. sec. 2; Federal Criminal Jury Instructions of the Seventh Circuit, No. 5.06, at 78-79 (1999). One can aid and abet the commission of an offense without engaging in activity that amounts to a crime in and of itself. See generally United States v. Irwin, 149 F.3d 565, 571-74 (7th Cir.), cert. denied, 525 U.S. 1031, 119 S. Ct. 571 (1998); United States v. Ortega, 44 F.3d 505, 507-08 (7th Cir. 1995). Here it happens to be the case that Hatchett aided and abetted Riley's distribution of cocaine by committing an act that does constitute a crime--Hatchett supplied Riley with the cocaine. But insofar as the elements of aiding and abetting are concerned, that point is incidental. Again, the government could have established Hatchett's liability as an aider and abettor in any number of ways that do not involve proof of an independent crime. See, e.g., Irwin, 149 F.3d at 575-76 (defendant aided and abetted drug conspiracy by, inter alia, acting as nominal owner of restaurant that served as meeting place for conspirators and by working at restaurant to maintain appearance that it was a legitimate business); Ortega, 44 F.3d at 507-08 (defendant aided and abetted narcotics sale by, inter alia, warranting to informant-buyer that the heroin he was purchasing was of "the best" quality).

Prior to Dixon, Vitale would have been of some help to Hatchett on this point. In Vitale, a teenaged driver had struck and killed two children. A police officer cited him at the scene for failing to reduce his speed in order to avoid an accident, and he subsequently pleaded guilty to that charge. Subsequently, the State initiated a juvenile proceeding alleging that the driver had committed involuntary manslaughter. The Illinois Supreme Court held that the manslaughter charge was barred by the Double Jeopardy Clause, reasoning that the lesser offense (failure to reduce speed) required no proof beyond that which was necessary to establish that the juvenile had committed involuntary manslaughter and that, consequently, the two offenses were essentially

the same. The U.S. Supreme Court agreed that "[i]f, as a matter of Illinois law, a careless failure to slow is always a necessary element of manslaughter by automobile, then the two offenses are the 'same' under Blockburger and Vitale's trial would constitute double jeopardy under Brown v. Ohio." 447 U.S. at 419-20, 100 S. Ct. at 2267 (emphasis supplied). However, the State contended that it could establish vehicular manslaughter without necessarily having to prove that the driver failed to reduce his speed (id. at 418, 100 S. Ct. at 2266) and the Supreme Court acknowledged that this was a genuine possibility (id. at 419, 100 S. Ct. at 2266-67). It therefore vacated the Illinois Supreme Court's judgment and remanded for further proceedings. The mere possibility that the State might rely upon the driver's failure to slow in order to establish that he committed involuntary manslaughter was not enough to trigger the double jeopardy bar, the Court explained. Id. at 419, 100 S. Ct. at 2266-67. Yet, the Court also indicated in dictum that a double jeopardy problem might be presented if it turned out that the State in fact would have to rely upon the driver's failure to slow in order to establish vehicular manslaughter.

[I]t may be that to sustain its manslaughter case the State may find it necessary to prove a failure to slow or to rely on conduct necessarily involving such failure; it may concede as much prior to trial. In that case, because Vitale has already been convicted for conduct that is a necessary element of the more serious crime for which he has been charged, his claim of double jeopardy would be substantial under Brown [v. Ohio] and our later decision in Harris v. Oklahoma, 433 U.S. 682, 97 S. Ct. 2912, 53 L.Ed.2d 1054 (1977).

447 U.S. at 420, 100 S. Ct. at 2267.

Vitale thus signaled the Court's willingness to expand the lesser-included-offense analysis of Harris beyond the relatively limited category of cases in which one offense (felony murder being the obvious example) always requires proof that some other, lesser offense occurred. The Illinois involuntary manslaughter statute did not require proof that the defendant had committed another offense, it simply required proof that the defendant had recklessly engaged in an act that was likely to cause death or great bodily harm. See 447 U.S. at 413 n.4, 100 S. Ct. at 2263 n.4. Even so, the Court appeared ready to hold that if, as a matter of fact, the prosecution in a particular case cannot establish the defendant's guilt on the greater offense without proving him guilty of the lesser offense as well, then the two offenses are the same for purposes of the

double jeopardy analysis.

The scenario that Vitale envisioned is exactly the one we confront here. As we have explained, the aiding and abetting charge did not, on its face, demand proof that Hatchett distributed cocaine or that he engaged in any other act that was criminal in and of itself. But as it happens, the government could not prove him guilty of aiding and abetting Riley without also proving each and every element of the distribution charge.

But Vitale's dictum has now been rejected, as the short life of Grady v. Corbin makes clear. Grady, as we mentioned earlier, embraced a double-jeopardy test that asked not only whether the two offenses in question had the same elements, but whether they rested on the same conduct. Grady, like Vitale, arose out of an automobile accident. The respondent, Corbin, had driven his automobile across the double yellow line of a highway and collided with two oncoming vehicles. The driver of one of those vehicles eventually died as a result of the collision, and her husband sustained serious injuries. Immediately after the accident, Corbin was cited for driving while intoxicated and for failing to keep to the right of the median. He pleaded guilty to those charges; and the sentencing judge, who was unaware that anyone had died as a result of the accident, suspended Corbin's driver's license for six months and imposed a modest fine. A grand jury subsequently indicted Corbin on charges of, inter alia, reckless manslaughter and criminally negligent homicide in connection with the death of the one accident victim, and reckless assault in connection with the injuries to the other. The prosecution filed a bill of particulars identifying three acts on which it would rely to establish that Corbin had operated his automobile in a negligent or reckless fashion: (1) driving while intoxicated; (2) failing to keep to the right of the median, and (3) driving at a rate of speed that was excessive given the weather and road conditions.

Taking its cue from Vitale, the Supreme Court concluded that double jeopardy principles prevented the prosecution of Corbin on the new charges. "As we suggested in Vitale, the Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted." 495 U.S. at 521, 110 S. Ct. at 2093. Notably, none of the charges at issue in Grady required proof that another offense per se had occurred, as was true in Harris, for example; they simply required proof that Corbin had

engaged in negligent or reckless behavior. That point was plainly immaterial to the Court. In the Court's view, so long as the circumstances of the case required the prosecution to establish the same conduct that underlay a prior conviction, the Double Jeopardy Clause was implicated. See id. at 521, 110 S. Ct. at 2093 ("[t]he critical inquiry is what conduct the State will prove . . ."). The State therefore could not prosecute Corbin for reckless manslaughter, negligent homicide or reckless assault if, in order to establish the requisite negligence or recklessness, the State would have to prove that Corbin drove while intoxicated or failed to keep to the right of the median, because those manifestations of negligence and/or recklessness amounted to offenses for which he had already been convicted. Id. at 522-23, 110 S. Ct. at 2094. On the other hand, the State was free to prosecute Corbin a second time if it could establish his negligence or recklessness by proof of other conduct. Id. at 523, 110 S. Ct. at 2094. The State's bill of particulars did identify one act--driving at an excessive rate of speed--that stood apart from the conduct underlying Corbin's previous convictions. At the same time, the bill also disclosed that driving while intoxicated and failing to remain on the right side of the median were essential to the State's case. Id. at 523, 110 S. Ct. at 2094. That was enough for the Court to resolve the double jeopardy question:

By its own pleadings, the State has admitted that it will prove the entirety of the conduct for which Corbin was convicted--driving while intoxicated and failing to keep right of the median--to establish essential elements of the homicide and assault offenses. Therefore, the Double Jeopardy Clause bars this successive prosecution . . . .

Ibid.

In all material respects, the instant case is indistinguishable from Grady./5 The government has conceded that in order to prove Hatchett guilty of abetting and abetting Riley's distribution of cocaine to Panzer and Hess, it necessarily had to establish that Hatchett supplied the cocaine to Riley. That concession, like the bill of particulars in Grady, leaves no doubt that conviction on the second, greater charge depends on proof of conduct that constitutes the first, lesser offense. If Grady remained good law, then, we would deem the distribution charge and the aiding and abetting charge to be a single offense for which (absent a congressional signal to the contrary) only one punishment could be imposed.

But Grady, after all, has been overruled. The Supreme Court in Dixon unequivocally rejected Grady's "same conduct" test, see 509 U.S. at 711, 113 S. Ct. at 2864 ("[Grady] was a mistake"), and in equally clear terms, the Court emphasized that the double jeopardy inquiry must focus on the elements of the two offenses in question, rather than conduct underlying them, see 509 U.S. at 705-10, 113 S. Ct. at 2860-63. Dixon did leave undisturbed the lesser-included offense rationale of Harris and similar cases, but the Court's discussion of those precedents again makes clear that the lesser-included-offense analysis turns on the elements of the crimes rather than the conduct involved. Indeed, in assessing the preclusive effect of the respondents' contempt convictions, each of the three justices who wrote opinions applying the lesser-included-offense analysis focused on the extent to which the contempt charges had required proof of an independent offense--possession of narcotics with the intent to distribute, assault, and so on. Compare id. at 697-98, 705-07, 113 S. Ct. at 2856-57, 2860-62 (Scalia, J.), and id. at 732-33 & n.7, 113 S. Ct. at 2875 & n.7 (White, J.), with id. at 717, 113 S. Ct. at 2867 (Rehnquist, C.J.). The crime of aiding and abetting, as we have explained, has no element that incorporates another offense. It simply happens to be the case here that in order to prove that Hatchett facilitated Riley, the government had to establish conduct that constituted a separate offense with which Hatchett had also been charged. But the fact that the act by which Hatchett aided and abetted Riley's distribution of cocaine constituted an independent crime is utterly irrelevant to Hatchett's liability as an aider and abettor. The government had only to prove the conduct underlying the distribution charge against Hatchett in order to prove him liable for Riley's re-distribution to Panzer and Hess; it did not have to prove that he committed the offense of distribution (or any other independent crime). Only Vitale's dictum and Grady's holding recognized this scenario as one in which multiple prosecutions or punishments would be forbidden. But Dixon has firmly closed the door on both.

We note that the First Circuit, in a similar case that also post-dates Dixon, has reached the same conclusion that we do today. See United States v. Colon-Osorio, 10 F.3d 41, 45-46 (1st Cir. 1993), cert. denied, 512 U.S. 1239, 114 S. Ct. 2749 (1994). In Colon-Osorio, a defendant who had been released on bond while awaiting trial failed to appear on two occasions. After he was apprehended, the defendant was tried and convicted for the failure to appear following release on bail. Based on the weapons that were

found in his possession at the time of his arrest, a grand jury later indicted him on multiple charges of possessing a firearm while a fugitive from justice. The district court dismissed those charges on double jeopardy grounds, but the First Circuit reversed. The appellate court noted that the failure-to-appear and fugitive-in-possession charges each required proof that the other did not: the former required proof that the defendant had been released on bail, but that proof was not invariably necessary in order to show that the defendant was a fugitive from justice; and the fugitive-in-possession charge required proof that the defendant possessed a firearm, whereas the failure-to-appear charge obviously did not. Id. at 45. The district court had concluded nonetheless that the failure-to-appear charge was essentially a lesser-included offense of the fugitive-in-possession charge. The lower court had pointed out that in order to prove that the defendant was a fugitive from justice, the government would have to prove that he fled in order to avoid prosecution, and that showing would in turn require proof of the very same facts that were necessary to establish that he failed to appear, i.e., that he was under indictment, that he was required to appear before a court, and that he failed to do so. See id. The appellate court found this rationale dubious in light of Dixon and its focus upon offense elements rather than conduct. Id. at 45-46. In any case, the court continued, the government was not relying on the offense of bail-jumping in order to establish that he was a fugitive; "[t]he government merely will rely on the same conduct that the government proved to establish Colon-Osorio's bail-jumping offense." Id. (emphasis in original). The fact that this conduct happened to constitute a separate offense did not raise a double jeopardy problem, in the court's view.

Indeed, the district court's analysis is precisely what the Dixon Court rejected. Under Dixon, the fact that the government will attempt to prove that Colon-Osorio was a fugitive by referring to the same conduct used to prove the elements of failure to appear does not offend the Double Jeopardy Clause. The same actions can constitute an offense under two distinct statutes and can be prosecuted separately under each statute as long as the statutes do not define a single offense within the meaning of Blockburger. United States v. White, 1 F.3d 13, 17 (D.C. Cir. 1993); see also Blockburger, 284 U.S. at 304, 52 S. Ct. at 182 (quoting More v. Commonwealth, 108 Mass. 433 (1871)).

10 F.3d at 46. See also United States v. Forman, 180 F.3d 766, 768-70 (6th Cir. 1999); United

States v. Lanoue, 137 F.3d 656, 661-62 (1st Cir. 1998); United States v. Celestine, 902 F. Supp. 1058, 1060-62 (D. Alaska 1995), aff'd on other grounds without published op., 83 F.3d 429, text in Westlaw, 1996 WL 184469 (9th Cir. April 17, 1996).

For all of these reasons, we conclude that the offenses charged in Counts One and Two of the indictment did not constitute a single offense within the Blockburger framework. The two charges were distinct in the sense that each required proof of an element that the other did not. Moreover, although, under the circumstances of this particular case, the aiding and abetting charge required proof of the very same conduct which underlay the distribution charge, the aiding and abetting charge did not demand proof that Hatchett had committed any other crime, be it narcotics distribution or something else. Consequently, in light of Dixon, the distribution charge cannot be described as a lesser included offense of the aiding and abetting charge.

B.

Hatchett contends that the district court abused its discretion in permitting Robert Panzer to testify that he had purchased crack cocaine from Hatchett (through Riley) one month before the transaction with which he was charged in this case. As we have noted, the court deemed this testimony admissible pursuant to Rule 404(b), which grants the district court discretion to admit evidence of a defendant's "other crimes, wrongs, or acts" in order to establish something other than the defendant's propensity to engage in criminal conduct. See generally United States v. Wash, 231 F.3d 366, 370 (7th Cir. 2000); United States v. Swan, 224 F.3d 632, 637 (7th Cir. 2000), amended in other respects, 230 F.3d 1040 (7th Cir. 2000). Of the four criteria that govern the admission of Rule 404(b) evidence (see, e.g., Wash, 231 F.3d at 370; United States v. Williams, 216 F.3d 611, 614 (7th Cir. 2000)), Hatchett contends that Robert's testimony failed two: (1) the testimony did not serve to establish any factor that was genuinely in dispute, apart from Hatchett's propensity to engage in narcotics trafficking, and (2) Robert's testimony was not sufficiently reliable to establish that Hatchett had previously distributed cocaine.

We are satisfied that testimony concerning the October transaction was admissible to establish Hatchett's knowledge, if nothing else. In discussing Hatchett's double jeopardy claim, we pointed out that in order to prove Hatchett guilty of distributing cocaine to Riley, the government was obliged to prove that Hatchett knowingly and intentionally distributed the

narcotic to Riley and that he knew cocaine was a controlled substance. Similarly, in order to prove that Hatchett aided and abetted Riley, the government was required to show, inter alia, that Hatchett knowingly associated himself with Riley's delivery of the cocaine to Panzer and Hess. Ante at 8-9. Hatchett's awareness of the illicit nature of the business that Riley was transacting with Panzer and Hess on November 24 was thus a key element of the prosecution's case. Although Hatchett insists that his knowledge was actually not in issue, because he simply argued that he did not supply Riley with the cocaine (Blue Br. at 27), the record belies his contention. In fact, Hatchett specifically denied having any knowledge that Riley was distributing cocaine to Panzer and Hess. R. 70 at 11-12, 14. Under these circumstances, we believe that testimony concerning the October transaction-- which involved both Riley and Panzer's brother-- was admissible to prove that Hatchett was not merely an unwitting bystander to the distribution of crack cocaine, but a knowing participant. See United States v. Mounts, 35 F.3d 1208, 1214 (7th Cir. 1994), cert. denied, 514 U.S. 1020, 115 S. Ct. 1366 (1995); United States v. Kreiser, 15 F.3d 635, 640-41 (7th Cir. 1994).

We are also satisfied that Panzer's testimony concerning the October transaction was sufficiently reliable to qualify for admission under Rule 404(b). See Huddleston v. United States, 485 U.S. 681, 689-90, 108 S. Ct. 1496, 1501-02 (1988); see also, e.g., United States v. Wimberly, 60 F.3d 281, 285 (7th Cir. 1995), cert. denied, 516 U.S. 1063, 116 S. Ct. 744 (1996); United States v. Williams, 31 F.3d 522, 527 (7th Cir. 1994). Robert Panzer was a participant in the previous transaction, obviously, and as such had first-hand knowledge of its details. See United States v. Allison, 120 F.3d 71, 75 (7th Cir.), cert. denied, 522 U.S. 987, 118 S. Ct. 455 (1997), citing United States v. Long, 86 F.3d 81, 85 (7th Cir. 1996). Robert's character and motives were by no means pure, as Hatchett is quick to point out. But the fact that Robert himself was a felon, and obviously stood to gain by cooperating with the government, is by no means remarkable. See, e.g., United States v. McEntire, 153 F.3d 424, 436 (7th Cir. 1998); United States v. Curry, 79 F.3d 1489, 1496 (7th Cir. 1996).

Consequently, we find no abuse of discretion in the district court's decision to admit Robert Panzer's testimony. The testimony was probative of Hatchett's knowledge as to the nature of the November 24 transaction. Moreover, the district court appropriately instructed the jury as to the limited purposes for which it might consider this evidence. That cautionary instruction adequately

addressed the concern that the jury might improperly infer from the testimony a propensity on Hatchett's part to engage in narcotics transactions. See Williams, 216 F.3d at 615; United States v. Rivera, 6 F.3d 431, 444 (7th Cir. 1993), cert. denied, 510 U.S. 1130, 114 S. Ct. 1098 (1994).

C.

At the close of the defense case, Hatchett offered into evidence a laboratory report prepared by the Wisconsin Crime Laboratory which indicated that a fingerprint located on a metal cigar box in which Hatchett had delivered the crack cocaine to Riley could not be identified as belonging to either Hatchett or Riley. Hatchett contended principally that the report was admissible as a public record pursuant to Fed. R. Evid. 803(8)./6 Absent a stipulation between the parties as to the authenticity of the lab report, the district court declined to admit the report into evidence without appropriate testimony from a foundation witness. R. 80 at 270-71. Although the defense had already rested, the court indicated that it was prepared to allow Hatchett to re-open his case in order to supply that testimony. "If that's what you want to do," Judge Shabaz remarked, "I'll give you that opportunity." Id. at 271. Hatchett's counsel declined the court's offer, however:

In all candor, Your Honor, I did not subpoena Mr. Heslip [the laboratory analyst] nor will I ask the Court to reopen evidence. This was my attempt to offer this document in this format and that was my choice, so I will live with the Court's ruling.

Id.

Hatchett contends that the laboratory report was admissible pursuant to Rule 803(8)(C), which provides that official investigative findings are admissible "against the Government in criminal cases," unless there is reason to doubt their reliability. See n.6, supra. In passing, the district judge expressed doubt whether subsection (C) applied, because "this isn't a matter against the government." R. 80 at 271. In this respect the judge misread the rule, which requires only that the report be offered against the government, not that the proceeding be one against the government, e.g., United States v. King, 613 F.2d 670, 673 n.4 (7th Cir. 1980), and Hatchett seizes on this one remark as the basis for his appeal on this issue.

At most, however, the district court's construction of Rule 803(8)(C) amounted to an

alternative ground for excluding the report. The principal reason why the court did not admit the report, and the one it cited both first and last in its ruling, was the lack of a witness who could identify and authenticate the report. See R. 80 at 270-71. Read in their entirety, the district court's remarks leave no doubt that, irrespective of its understanding as to the scope of Rule 803(8)(C), the court would not have allowed the lab report into evidence without foundation testimony from an appropriate witness. See United States v. Romo, 914 F.2d 889, 896 (7th Cir. 1990), cert. denied, 498 U.S. 1122, 111 S. Ct. 1078 (1991).

Hatchett has not addressed the district court's observations with respect to the need for a foundation witness./7 "[I]n situations in which there is one or more alternative holdings on an issue, we have stated that failure to address one of the holdings results in a waiver of any claim of error with respect to the court's decision on that issue." Kauthar Sdn Bhd v. Sternberg, 149 F.3d 659, 668 (7th Cir. 1998), cert. denied, 525 U.S. 1114, 119 S. Ct. 890 (1999). That is the case here. Having failed to address an integral aspect of the court's rationale, Hatchett cannot show that the district court abused its discretion in excluding the report.

III.

We AFFIRM Hatchett's conviction and sentence.


/1 Hatchett's two convictions were grouped together for sentencing purposes, see U.S.S.G. sec. 3D1.2(d), and the district court imposed a single term of incarceration. Effectively, then, Hatchett was sentenced to concurrent prison terms of 90 months on both counts of conviction. See id. sec. 5G1.2(b), (c). Of course, as we have noted, he was also required to pay a separate special assessment for each count. See Robinson v. United States, 196 F.3d 748, 754 (7th Cir. 1999), vacated & remanded on other grounds, 121 S. Ct. 851 (2001).

/2 Only Justice Blackmun believed that Grady would permit the subsequent charges. See id. at 741-43, 113 S. Ct. at 2878-81 (Blackmun, J., concurring in the judgment in part and dissenting in part). Justice White found it unnecessary to consider whether or not Grady would have permitted the later charges. See id. at 720-21, 113 S. Ct. at 2869, 2879 (White, J., concurring in the judgment in part and dissenting in part).

/3 It was not obvious to Justice Scalia that the word "assault" in the civil protection order

necessarily forbade only those assaults that were barred by the local criminal code. However, the trial court had construed the term in that way, and the parties had not contested that construction. Id. at 700 n.3, 113 S. Ct. at 2858 n.3.

/4 The remaining justices, Justices Blackmun and Souter, did not focus on the lesser-included offense analysis. See id. at 741-43, 113 S. Ct. at 2879-81 (Blackmun, J., concurring in the judgment in part and dissenting in part) (asserting that contempt of court serves to vindicate the authority of a court's orders rather than to punish the contemnor for whatever criminal acts he may have committed; consequently, Harris' lesser-included-offense analysis is inapt); id. at 743-63, 113 S. Ct. at 2881-91 (Souter, J., concurring in the judgment in part and dissenting in part) (disagreeing with majority's decision to overrule Grady, and concluding that the subsequent charges against Dixon and Foster were barred under that jettisoned precedent).

/5 Of course, this case involves a single proceeding, rather than successive prosecutions, but we apply the same standards in deciding whether the defendant impermissibly has been punished twice for the same offense. See, e.g., Dixon, 509 U.S. at 696, 113 S. Ct. at 2856.

/6 The rule provides:

Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the source of information or other circumstances indicate lack of trustworthiness.

Fed. R. Evid. 803(8).

/7 For example, although "the public records exception often requires no foundation witness at all," 4 Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence sec.453, at 548 (2d ed. 1994), Hatchett has made no argument that the laboratory report at issue here constitutes the type of self-authenticating document that is admissible without any additional foundation. See

Fed. R. Evid. 902.