Kevin KRUSHENSKY, Appellant
and Cross–Appellee,

v.

Christine FARINAS, Appellee
and Cross–Appellant.

Nos. S–12395, S–12416.

Supreme Court of Alaska.

Aug. 8, 2008.

Andrew L. Josephson, Law Offices of Dan Allan, Anchorage, for Appellant and Cross–Appellee.

Karla F. Huntington, Eagle River, for Appellee and Cross–Appellant.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

In accordance with Kevin Krushensky and Christine Farinas's property settlement agreement and a memorializing final property order, qualified domestic relations orders (QDROs) were to be entered for Kevin's two retirement plans. The QDROs were to designate Christine "the surviving spouse to be awarded all pre-retirement death benefits ... for at least a 55% annuity." But as ultimately entered, the QDROs also awarded Christine qualified pre-retirement survivor annuities (QPSAs). Kevin appeals the QPSA awards. Because the QDROs correctly used a separate interest approach to divide each retirement plan, Christine's interests were separate from Kevin's upon entry of the QDROs and would not be reduced if he died before retiring. Awarding the QPSAs to Christine therefore gave her more than what the parties agreed to and more than what the memorializing final property order required. We consequently vacate the bench order that approved including QPSAs in the QDROs, and remand. Kevin also appeals the denial of his request for a visitation credit. Because Kevin has waived any challenge to the superior court's ruling that his request was untimely, we affirm.

## II. FACTS AND PROCEEDINGS

Kevin Krushensky and Christine Farinas married in August 1993. They have one child, born in July 1999. In November 2004 Kevin filed for divorce. Christine is a resident of Hawaii but she submitted to the jurisdiction of the Alaska court for all issues governing dissolution of the marriage, division of the marital property, and child support. In June 2005 the parties reached a settlement of all property and financial issues, including a division of Kevin's British Petroleum (BP) and ConocoPhillips defined benefit retirement accounts, and orally placed the settlement on record.

In September 2005 the superior court issued a final property order that was intended to memorialize the parties' settlement agreement. The final property order provides for entry of qualified domestic relations orders (QDROs):

> 3. A QDRO shall issue awarding Ms. Farinas–Krushensky 55% of Mr. Farinas–Krushensky's work[-]related defined benefit pension(s) earned by Mr. Farinas–Krushensky from date of marriage through November 15, 2004. These are known as the BP Retirement Accumulation Plan, and the Retirement Income Plan of Phillips Petroleum. *In each QDRO, Ms. Farinas–Krushensky shall be designated the surviving spouse to be awarded all pre-retirement death benefits, and she shall be designated the surviving spouse for at least a 55% annuity benefit in the event that Mr. Farinas–Krushensky dies before her.* The cost of the survivor annuity benefits shall be shared equally between the parties. To the extent allowed by the retirement plan, she shall be allowed to begin receiving her benefits at the earliest allowable date. Ms. Farinas–Krushensky's attorney is responsible for drafting the QDRO orders.

(Emphasis added.) The final property order also states that "[t]he monthly child support

shall not be reduced for any reason other than the medical premium."

Christine filed proposed QDROs for BP and ConocoPhillips in the superior court. Kevin's lawyer forwarded Christine's proposed QDROs to David Watson, a former employee of the State of Alaska's Division of Retirement and Benefits, who was deemed an expert in this case. Watson explained that the BP and ConocoPhillips plans had particular technical requirements that the proposed QDROs likely did not meet. Kevin filed a Limited Opposition to Christine's proposed QDROs, stating that he "does not oppose them but is skeptical about their prospects for plan approval." The superior court signed the QDROs for both plans and Christine promptly sent them to their respective plan administrators for approval.

In December 2005 BP's plan administrator rejected the signed BP QDRO as "not qualified" because the order—which failed to identify whether Christine was awarded a shared interest or a separate interest in the retirement account—was unclear regarding Christine's award.

Under a shared interest approach to dividing a retirement account, the parties' interests are intertwined and the alternate payee can receive benefits only when the plan participant chooses to retire and begins receiving benefits.[1] Under this approach the alternate payee's benefits terminate completely upon the plan participant's pre-retirement death.[2] But under a separate interest approach, the alternate payee's interest is severed from the plan participant's interest upon the plan administrator's acceptance of the plan, and the alternate payee may receive benefits when the plan participant reaches, or would have reached, the plan's earliest retirement age, regardless of whether the plan participant continues working after reaching retirement age or dies before reaching that age.[3]

Marsha Dunham of ConocoPhillips also informed Christine's lawyer that the Conoco-

---

1. DAVID CLAYTON CARRAD, THE COMPLETE QDRO HANDBOOK 70 (2d ed. 2004).

2. *Id.*

3. *Id.* at 111–12; *see also* Pamela D. Perdue, *Bankruptcy and Qualified Plans, in* ALI–ABA Course of Study, FUNDAMENTALS OF EMPLOYEE BENEFIT LAW 799, 823 (2007), *available at* SM058 ALI–ABA 799 (Westlaw).

Phillips QDRO would be rejected. Dunham likewise indicated confusion over whether the QDRO was to be a shared benefit award or a separate benefit award. ConocoPhillips formally rejected the QDRO in December 2005.

Christine filed amended proposed QDROs in March 2006. Her amended proposed BP QDRO contained language similar to the language of the final property order. Her amended proposed ConocoPhillips QDRO contained a survivorship provision in the form of a qualified pre-retirement surviving spouse annuity (QPSA).[4] According to Watson a QPSA is typically awarded when a retirement plan is divided under the shared interest approach; the QPSA protects the alternate payee in the event of the plan participant's pre-retirement death. A QPSA is an annuity payable to the alternate payee for her lifetime if the plan participant dies before reaching retirement age.[5]

Kevin opposed the amended QDROs proposed by Christine, arguing that granting Christine both a separate interest and a QPSA would amount to "double-dipping": in the event of Kevin's pre-retirement death, the award would enable Christine to receive, in addition to her separate interest entitlement, a portion of Kevin's entitlement as the surviving beneficiary.

Kevin then filed proposed QDROs prepared by Watson. These QDROs contained no QPSAs.[6] Kevin also moved for attorney's fees incurred in reviewing and challenging Christine's amended proposed QDROs.

In June 2006 the superior court held a hearing on the retirement issue. Watson testified that Kevin's proposed QDROs accu-

---

4. The ConocoPhillips amended proposed QDRO stated:

 If this Order is received by the Plan Administrator prior to Participant's death and is subsequently determined to be a Qualified Domestic Relations Order and Participant dies before the Alternate Payee, Alternate Payee shall be considered a surviving spouse of the Participant under Section 401(a)(11) of the Internal Revenue Code and Section 205 of ERISA, and Alternate Payee's share of the qualified pre-retirement surviving spouse annuity (QPSA) shall be 100%.

5. GALE S. FINLEY, ASSIGNING RETIREMENT BENEFITS IN DIVORCE 61 (2d ed. 1999). Section 417(c)(1) of the Internal Revenue Code defines "qualified preretirement survivor annuity" as:

 a survivor annuity for the life of the surviving spouse of the participant if—
 (A) the payments to the surviving spouse under such annuity are not less than the amounts which would be payable as a survivor annuity under the qualified joint and survivor annuity under the plan (or the actuarial equivalent thereof) if—
 (i) in the case of a participant who dies after the date on which the participant attained the earliest retirement age, such participant had retired with an immediate qualified joint and survivor annuity on the day before the participant's date of death, or
 (ii) in the case of a participant who dies on or before the date on which the participant would have attained the earliest retirement age, such participant had—
 (I) separated from service on the date of death,
 (II) survived to the earliest retirement age,
 (III) retired with an immediate qualified joint and survivor annuity at the earliest retirement age, and

 (IV) died on the day after the day on which such participant would have attained the earliest retirement age, and
 (B) under the plan, the earliest period for which the surviving spouse may receive a payment under such annuity is not later than the month in which the participant would have attained the earliest retirement age under the plan.
 I.R.C. § 417(c)(1) (2006).

6. Kevin's proposed QDROs similarly granted Christine a separate interest of fifty-five percent but stated:

 (b) If the Participant dies or terminates his employment with the Company *after* satisfying the vesting requirements of the Retirement Plan but *before* the Alternate Payee has commenced her benefit, the Alternate Payee shall be entitled to the benefit provided above as though the Participant has not died, and no other benefit shall be provided to the Alternate Payee under the Plan. Once retirement benefit payments have commenced to the Alternate Payee, the Alternate Payee's separate entitlement under her separate interest award shall *not* be affected by the death of the Plan Participant. It is understood that the Plan Administrator applies a totally severed approach in administering their separate interest QDRO's, and that the Participant's death, either before or after retirement, will not affect the Alternate Payee's rights to her benefits as set forth herein. The retirement benefit assigned to the Alternate Payee under the Order shall not be reduced, abated, or terminated upon the death of the Plan Participant.
 (Emphasis in original.)

rately fulfilled the final property order because QPSAs were not needed to protect Christine's separate interest in the event Kevin died before retirement. Watson also testified that Christine's amended proposed QDROs did not accurately reflect the final property order because the final property order did not state that pre-retirement benefits were to come out of Kevin's remaining separate interest.

The superior court ruled from the bench that Christine was entitled to pre-retirement benefits in the form of QPSAs, but limited the QPSA benefits to the period of coverture. The court indicated that it would sign Kevin's proposed QDROs in the interim and directed Watson to prepare new QDROs conforming to the court's bench ruling. The court signed Christine's amended proposed QDROs, not Kevin's, the same day.

Kevin submitted the court-ordered QDROs on June 20, noting his objections concerning the survivorship benefits issue. Both court-ordered QDROs contain a QPSA provision. For example, the court-ordered ConocoPhillips QDRO states:

> (12) Pre-retirement Death of Participant:
>
> In the event the Participant dies prior to commencing his benefit, the Alternate Payee will be treated as the Participant's spouse for the purpose of receiving a portion of the Participant's Qualified Pre-retirement Survivor Annuity (QPSA) attributable to the Participant's remaining benefit. The Alternate Payee is entitled to a share of the QPSA proportionate to the Alternate Payee's share of the Participant's total vested accrued benefit as of the last day of the month of November, 2004, *in addition* to the awarded benefit.

(Emphasis in original.)

In October 2006 Kevin asked for a visitation credit on the theory that the Hawaii court, which had jurisdiction over the child custody issues, had awarded him twenty-eight days of visitation each July. Kevin also requested a ruling on his motion for attorney's fees. In February 2007 the court denied the visitation credit motion, both because the time for seeking reconsideration of the final property order or for appealing had run, and because Kevin had not presented evidence to support a finding of changed circumstances.

Kevin appeals the bench order awarding QPSAs to Christine and the denial of his renewed motion for a visitation credit. Kevin also alleges that the court committed plain error when it signed Christine's amended proposed QDROs after indicating that it would sign Kevin's proposed QDROs. Finally, Kevin argues that he should be awarded attorney's fees incurred in monitoring Christine's proposed QDROs and drafting the court-ordered QDROs. Christine cross-appeals the bench order limiting the QPSA awards to the coverture period.[7]

## III. DISCUSSION

### A. Standard of Review

 We construe property settlement agreements in divorce actions in accordance with basic principles of contract law.[8] If contract language is unambiguous, we decide the meaning of the contract as a matter of law.[9] We determine de novo whether relief requested by a former spouse constitutes enforcement or modification of a property settlement agreement.[10]

[4, 5] This case requires us to interpret the final property order that was intended to memorialize the parties' settlement agree-

---

7. The captions on the parties' appellate briefs list their names as Kevin Farinas–Krushensky and Christine R. Farinas–Krushensky, but it appears that they have since returned to their pre-marriage names.

8. *Keffer v. Keffer*, 852 P.2d 394, 397 (Alaska 1993) (holding that husband was not obligated to ex-spouse for payments derived from investment income because dissolution agreement excluded "income earned outside of primary place of employment").

9. *Id.*

10. *Williams v. Crawford*, 982 P.2d 250, 253 (Alaska 1999) (holding that agreement obligating former husband to name former wife as recipient of pension's survivorship benefit did not entitle former wife to guaranteed annuity in amount she would have received had she remained statutorily eligible for survivorship benefits).

ment. The order was not intended to be the court's independent determination of how the property should be divided. We therefore apply to the final property order the same review principles we apply to contract disputes. Likewise, in entering the bench order that approved inclusion of QPSAs in the QDROs, it appears the superior court was attempting to give effect to the parties' agreement as memorialized in the final property order. We therefore give that bench order de novo rather than deferential review.

 "The award of attorney's fees in a divorce action is committed to the sound discretion of the trial court ... [and] will not be disturbed on appeal unless it is arbitrary, capricious, manifestly unreasonable, or stems from an improper motive." [11] We also review a superior court's ruling on child support for abuse of discretion.[12] An abuse of discretion will be found if, after reviewing the record as a whole, we are left with a definite and firm conviction that a mistake has been made.[13]

## B. Inclusion of Qualified Pre–Retirement Survivor Annuities in the Qualified Domestic Relations Orders

### 1. Signing Christine's orders

 At the June 2006 hearing the superior court directed Watson to prepare corrected QDROs conforming to his bench order. Noting that a delay in the preparation of corrected QDROs might cause the parties to miss BP's filing deadline, Christine's lawyer asked the court to sign either Christine's amended proposed QDROs or Kevin's proposed QDROs as placeholders, "with it being very clear that this court, which retains jurisdiction to change the orders, would change them almost immediately." The court indicated that it would sign Kevin's proposed QDROs but, apparently inadvertently, instead signed Christine's amended proposed QDROs on the day of the hearing.

Kevin argues that the superior court committed plain error when it signed Christine's amended proposed QDROs. But as Kevin himself acknowledges, any error that the superior court may have committed is harmless because on September 7, 2007 the court signed the court-ordered QDROs.

Kevin also argues that Christine's amended proposed QDROs added terms and provisions in favor of Christine that were not granted in the court's final property order. Because the court-ordered QDROs signed on September 7 supersede the previously signed QDROs, it is irrelevant whether the previously signed QDROs conflict with the final property order.

### 2. Awarding Christine pre-retirement benefits in addition to a separate interest in Kevin's retirement plans

 The final property order requires entry of QDROs designating Christine "the surviving spouse to be awarded all pre-retirement death benefits ... for at least a 55% annuity" for Kevin's two retirement plans. The parties disagree on how to functionally interpret the phrase "all pre-retirement death benefits." The superior court interpreted the phrase to refer to a QPSA, and awarded Christine a QPSA under each QDRO, with benefits limited to the amount earned during the period of coverture.

Kevin argues that the final property order's inclusion of the words "pre-retirement death benefits" merely indicates that the parties intended to protect Christine's entitlement in the event of Kevin's pre-retirement death. Kevin asserts that because each retirement plan was a defined benefit plan under which each party received a separate, disentangled interest, Christine's interest would be protected without including a QPSA in each QDRO. Kevin argues that the segregation of interests "nullifies the survivorship provision by negating the need for it altogether."

11. *Gallant v. Gallant,* 945 P.2d 795, 803 (Alaska 1997) (citation omitted) (holding that superior court did not err by refusing to award ex-husband attorney's fees absent finding of bad faith on part of ex-wife).

12. *Duffus v. Duffus,* 72 P.3d 313, 316 (Alaska 2003).

13. *Flannery v. Flannery,* 950 P.2d 126, 129 (Alaska 1997).

Kevin also argues that as a matter of public policy the QPSAs should not be awarded. He points to David Watson's sworn statement that "[a] QDRO that awards the alternate payee a shared interest in the participant's separate interest *in addition to* her awarded separate interest defeats the rationale for separate interest QDROs." (Emphasis in original.) Kevin argues that this type of award inequitably enriches the former spouse at the expense of future beneficiaries.

Christine argues in response that "parties can identify and exchange assets in a settlement in a manner that, while permissible, is not likely to occur in a judge[-]crafted order after a trial." She asserts that the parties agree on the technical wording of the final property order: they agree that the phrase "pre-retirement death benefits" refers to a QPSA and that the final property order's statement that "she shall be allowed to begin receiving her benefits at the earliest allowable date" indicates the parties intended a separate interest award to Christine. Christine also argues that the public policy interest in encouraging and supporting settlements [14] supports the superior court's interpretation of the final property order because the QPSAs awarded to Christine resulted from a settlement agreement, not from an equitable division by a court.

Even though the final property order memorialized the parties' settlement agreement, the court-ordered QDROs fail to achieve what the parties intended. The parties agree that the QDROs should be structured so that each party has a separate interest in the retirement benefits. Watson explained in an affidavit that

> [a] properly drafted separate interest order allows the parties to disentangle their affairs and it is fair to both parties. A separate interest QDRO means the alternate payee owns her separate interest and can commence her benefit when the participant attains the plan's earliest retirement

age, even though the participant may remain active in the plan.

Watson also explained that defined benefit retirement plans—such as the BP and ConocoPhillips retirement plans—that apply a "totally severed approach" to separate interest QDROs "create the alternate payee's separate interest immediately upon acceptance and qualification of the order." He further explained that a separate interest QDRO, in which the alternate payee's entitlement is severed from the plan participant's entitlement when the QDRO is entered, enables an alternate payee to begin receiving her entitlement when the plan participant reaches retirement age, whether the participant actually retires or continues working. If the plan participant dies before retirement, the alternate payee may begin receiving benefits when the participant would have reached retirement age; the participant's death, whether it occurs before or after the participant reaches retirement age, therefore does not affect the alternate payee's entitlement.[15]

But including a QPSA in a separate interest QDRO affects the entitlements of both the alternate payee and the participant if the participant dies before reaching retirement age. On the date the participant would have reached retirement age, inclusion of a QPSA would allow the alternate payee to receive, for the rest of her life,[16] both her separate entitlement and a percentage of the participant's separate entitlement.

Christine argues that QPSAs should be awarded here because both parties agree on the technical meaning of "pre-retirement benefits." At the June 2006 hearing Kevin identified a March 2006 email from ConocoPhillips's Marsha Dunham defining "pre-retirement death benefits" as "a qualified pre-retirement survivor annuity (QPSA)." But this does not establish that the parties understood the ramifications of QPSAs or agreed to QPSAs when they entered into their June 2005 settlement agreement. The parties may have misapprehended the nature of the plans, and thus did not understand that the

---

**14.** In support, she cites *Notkin v. Notkin*, 921 P.2d 1109, 1111 (Alaska 1996), and *Murphy v. Murphy*, 812 P.2d 960, 965 (Alaska 1991).

**15.** CARRAD, *supra* note 1, at 70.

**16.** FINLEY, *supra* note 5, at 61.

plans were defined benefit plans that fully protected Christine against the risk Kevin would die before becoming eligible to retire. But in any event, the text of the final property order, given the true nature of the plans, fully protected Christine and no QPSAs were needed. The opportunity for any misapprehension was significant. QPSAs are infrequently encountered and Watson refers to awarding a QPSA in a QDRO that provides each party a separate interest as a "common drafting error." But the agreed-upon goal of protecting Christine against Kevin's pre-retirement death did not justify or require QPSAs, especially after Watson's affidavit revealed that the parties misapprehended the nature of the parties' interests under the two plans.

Moreover, the text of the QDROs ultimately entered by the court is inconsistent with paragraph three of the final property order because the QDROs gave Christine substantially more than the parties bargained for. The bargained-for benefit as described in paragraph three gave Christine fifty-five percent of Kevin's defined benefit retirement plans for the coverture period. But the court-ordered QDROs containing the QPSAs state that Christine "is entitled to a share of the QPSA proportionate to the Alternate Payee's share of the Participant's total vested accrued benefit"—or fifty-five percent of the QPSA if Kevin died before retirement.

ConocoPhillips's Dunham informed the parties that the QPSA for the ConocoPhillips retirement account is a "50% joint-and-survivor annuity benefit"; in other words, the QPSA under the ConocoPhillips plan would award the alternate payee fifty percent of the benefits earned in the retirement account if the plan participant died before retirement. The QPSA percentage under the BP account

is not clear from the record. We assume for the sake of discussion that the BP account also uses a fifty-percent QPSA. In the event Kevin died before retirement and assuming fifty-percent QPSAs in both accounts, the court-ordered QDROs potentially gave Christine 67.4 percent of Kevin's retirement plans.[17] This inconsistency further demonstrates that the court-ordered QDROs did not achieve what the parties intended, as memorialized in paragraph three of the final property order.

This does not mean that the parties could not have settled on the terms Christine proposes. Watson testified that a QDRO could award an alternate payee both a separate interest and a shared interest in the participant's remaining benefit; in other words, he acknowledged that a separate-interest QDRO may permissibly include a QPSA. But given that such a bargain would have been unusual, and that such a bargain in this case would have conflicted with the language in the final property order and with the parties' reasonable expectations, enforcement of such a bargain would require much clearer language than is contained in the final property order. We consequently vacate the bench order approving QPSA awards and remand for entry of corrected QDROs.

Because the QPSA awards will be deleted on remand, we do not need to address Christine's argument that the superior court erred in limiting the awards to the coverture period.

### C. Denial of Kevin's Visitation Credit Request

Kevin next argues that he is entitled to a child support visitation credit because the Hawaii court granted him visitation for twenty-eight days each July.[18] Because

---

**17.** Applying those assumptions, Christine would receive her fifty-five percent separate entitlement plus fifty-five percent of the QPSA for each plan. Each QPSA would be fifty percent of Kevin's forty-five percent separate entitlement. The two awards would therefore grant Christine 67.4 percent of each retirement account (55% + 55% (50% × 45%) = 67.4%).

**18.** Alaska Civil Rule 90.3(a)(3) provides:
 The court may allow the obligor parent to reduce child support payments by up to 75%

for any period in which the obligor parent has extended visitation of over 27 consecutive days. The order must specify the amount of the reduction which is allowable if the extended visitation is exercised.

Commentary to the rule states that "[i]n considering a visitation credit, the court may consider the financial consequences to the parties of the visitation arrangement and a credit." Alaska R. Civ. P. 90.3 cmt. IV.B.

Christine was awarded the Hawaii home in the settlement and the home carries no mortgage, Kevin argues that Christine bears no increased expenses associated with their child when the child is in Alaska with Kevin.

Kevin first argued in his Alaska Civil Rule 78 objections to the final property order that he was entitled to a visitation credit. His objections asserted that the parties did not discuss visitation credits during settlement. When they settled, the parties had not resolved visitation issues in the Hawaii court. After the Hawaii court granted Kevin visitation for twenty-eight days each July, Kevin filed what he styled a Renewed Motion for Visitation Credit Based on Change of Circumstances.

The superior court denied this motion for two reasons. The court concluded that the motion was untimely because the court had already ruled on all issues and claims relevant to the visitation credit. The court also determined that the parties had been aware that a custody ruling was forthcoming but did not reserve the visitation dispute as a reason to further reduce child support; the visitation order therefore did not change the parties' circumstances. The court further determined that even if Kevin's motion was timely, he failed to present evidence regarding additional costs he would likely incur during their daughter's visitation that would support a reduction in his support obligation.

As Christine notes, Kevin does not address the timeliness issue in his opening brief on appeal; he argues only that the visitation award is a changed circumstance supporting a visitation credit award. Kevin's reply brief disputes that he waived his timeliness argument. He points to his Amended Points on Appeal, which include this point: "Appellant contends that the lower court erred when it denied a renewed motion for visitation credits." Kevin argues that "the high court could conclude that this proffer is comprehensive enough to speak to any reason that caused the denial." Although he argues that his appeal of the motion was timely, Kevin does not address the timeliness of the underlying motion. He merely asserts that the superior court "erred"; he does not assert facts to support a contention that the underlying motion was timely. We consequently consider this argument waived.[19] Because Kevin has waived his timeliness argument, we do not need to reach his changed circumstances argument.[20] We therefore affirm the superior court's decision not to award a visitation credit.

### D. Denial of Kevin's Attorney's Fees Request

■■■ Finally, Kevin asserts that he has had to "circle the wagons" and spend thousands of dollars monitoring Christine's efforts to "double-dip." He therefore argues that he should be awarded attorney's fees.

Kevin's opening brief on appeal states that his attorney's fee motion "has not been ruled on by the court." Although the superior court did not explicitly deny Kevin's motion for attorney's fees or state that neither party prevailed, a statement the court made to Christine's lawyer at the end of the July 2006 hearing implied that the court would not grant Kevin's motion.[21]

---

19. *Bodkin v. Cook Inlet Region, Inc.*, 182 P.3d 1072, 1076 (Alaska 2008); *Petersen v. Mut. Life Ins. Co.*, 803 P.2d 406, 410 (Alaska 1990) ("Where a point is not given more than a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

20. *See United States v. Hatchett*, 245 F.3d 625, 644–45 (7th Cir.2001) ("[I]n situations in which there is one or more alternative holdings on an issue, ... [the appellant's] failure to address one of the holdings results in a waiver of any claim of error with respect to the court's decision on that issue.") (internal quotations omitted); *see also San Antonio Press v. Custom Bilt Mach.*, 852 S.W.2d 64, 65 (Tex.App.1993) ("When a separate and independent ground that supports a judg-

ment is not challenged on appeal, the appellate court must affirm.").

21. This exchange occurred at the end of the July 2006 hearing:

MS. HUNTINGTON [Christine's lawyer]: I just have one last question, Your Honor, that's more housekeeping. Mr. Josephson filed a motion for costs and fees on the 13th. My understanding is unless Your Honor makes a decision of who prevail—who's the prevailing party, neither of us are going to be paying costs and fees, and I don't want to respond to a motion I don't have to respond to.
THE COURT: Save your money.

But because the court did not expressly rule on the motion for attorney's fees, we cannot determine whether the court exercised its discretion by deciding that no award of fees was either justified or required. Even though this appellate issue is mooted by our remand, Kevin may renew his motion on remand in the superior court.

## IV. CONCLUSION

We therefore AFFIRM as to the visitation credit but VACATE the QPSA awards and REMAND for entry of corrected QDROs.