In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3608

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BILLY L. HICKS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:08-cr-0045-WTL-KPF-1—**William T. Lawrence,** *Judge.*

ARGUED APRIL 13, 2010—DECIDED APRIL 4, 2011

Before WILLIAMS, SYKES, and TINDER, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* A jury found Billy Hicks guilty of one count of knowingly distributing cocaine base, in violation of 21 U.S.C. § 841(a)(1). Hicks appeals his conviction, arguing that the district court made several errors during trial. We find that the district court did not err when it dismissed a juror for cause based on her relation-

ship to a witness, admitted tape recordings between Hicks and a confidential informant, and allowed federal agents to testify about their personal observations. However, because we find that the district court improperly allowed evidence of Hicks's prior drug convictions in violation of Federal Rule of Evidence 404(b), we vacate his conviction and remand for a new trial.

## I. BACKGROUND

On July 17, 2006, Billy Hicks had a telephone conversation with Anthony Hurd about the possibility of Hurd purchasing a large amount of crack cocaine. What Hicks did not know was that Hurd was a confidential informant who called Hicks at the direction of the Federal Bureau of Investigation ("FBI"). The conversation was recorded, and the two discussed meeting up the next day for the exchange. During the conversation, neither spoke specifically about drugs; instead, the entire conversation took place in code (e.g., Hurd: "What's it looking like, still all good?" Hicks: "I'm here man, that's all you gotta do. Done bro, stop all that talking. Done.").

On the day of the exchange, Hurd and Hicks had a few other telephone conversations, all of which were recorded. During those conversations, Hicks mentioned that he wanted to meet Hurd at a location closer to where he was staying because Hicks did not want to "ride through town with all that shit." They finally agreed to meet at the home of a relative of Hicks's girlfriend, Tanya Lear. Hurd drove to the location with Kareem Jacox, an FBI agent acting undercover as a drug dealer, who waited in the car

during the exchange. There were also other law enforcement surveillance cars and a helicopter monitoring the area. Hurd had been given $2,500 cash from the FBI to purchase five ounces of crack cocaine and was wearing a body wire to record any conversations. He was also searched to ensure he had no drugs on him. Hurd left the car and met briefly with Hicks in the front yard of the house. The two then went inside and discussed price (e.g. Hurd: "[F]or the 4 . . . you keep sayin' the 4, then you keep going back to the 450." Hicks: "I said 450, 450, 'cause I'm charging 475, these other niggas who I dealing to . . . 5."). Other unidentified persons' voices were also recorded by Hurd's wire. When Hurd returned to the car he had four ounces of crack cocaine. No law enforcement officer saw what went on in the house.

After the FBI realized that Hurd had not received the expected amount of crack cocaine, Jacox called Hicks to arrange for a pick-up of the remaining ounce. They planned to meet on August 1 at a local restaurant. Jacox went to the restaurant at the agreed time and received new instructions from Hicks to instead meet him at a drugstore. As Jacox drove from the restaurant to the drugstore, he believed he was being followed by individuals doing counter surveillance for Hicks. His suspicions grew stronger when he arrived at the store and saw a man who stared at him for approximately fifteen minutes while talking on a cell phone. Jacox also noticed other people that he believed were watching him. Fellow undercover FBI agents monitoring the meeting also noticed that Jacox had been followed and that there were several individuals

doing counter surveillance. At some point, the FBI terminated the exchange based on these safety concerns.

In 2008, Hicks was arrested. Hicks told the arresting agent that he was not a big drug dealer, but only dealt in ounce quantities of crack cocaine. The government charged Hicks with one count of distributing more than 50 grams of crack cocaine, in violation of 21 U.S.C. § 841(a)(1). Hicks pleaded not guilty and went to trial in July 2009.

Approximately three weeks before trial, the government filed a motion to introduce evidence of Hicks's two prior drug convictions under Federal Rule of Evidence 404(b) to prove Hicks's knowledge of the drug industry and his intent to distribute crack cocaine during the July 2006 sale to Hurd. One of the convictions was for selling cocaine in 1998. The other was a 2002 conviction for cocaine possession. Hicks opposed the motion, but the district court granted it, finding that the convictions were admissible to show Hicks's knowledge and lack of mistake.

Three days before the trial was scheduled to commence, Hicks filed a motion for reconsideration of the court's denial of a prior motion to continue the trial and, in connection with a possible entrapment defense, tentatively stated that, "in light of this Court's [404(b)] ruling, Hicks and the undersigned counsel had to consider additional trial strategies. And, quite frankly, a final decision has not been made as to which strategy is more effective." The government then filed a trial brief in which it stated that it was "unknown" whether Hicks intended to present an entrapment defense, but argued that the defense was unavailable to Hicks. In response, Hicks filed an "entrap-

ment proffer" in which he again objected to the court's Rule 404(b) ruling. Hicks stated, "With the [court's] 404(b) ruling, Hicks has little choice but to take the stand, and he should be permitted to assert whatever defense he chooses."

Hicks's counsel did not make an opening statement and therefore Hicks did not refer to his entrapment defense at the beginning of trial. During trial, over defense counsel's objection, the government introduced several audio recordings of the telephone conversations between Hicks and Hurd (who was murdered before trial) and introduced testimony about the alleged counter surveillance observed at the drugstore on August 1. The court also allowed the government to introduce evidence of Hicks's two prior drug convictions at the close of its case-in-chief over Hicks's renewed objection. The court gave a limiting instruction explaining to the jury that the prior convictions could be considered "only on the questions of the [Hicks's] knowledge, intent, and lack of mistake."

The government then rested and the court released the jury. The court asked Hicks's attorney to "take the time necessary to talk with Mr. Hicks and decide on the entrapment" defense. After the recess, defense counsel told the court, "After a long discussion with my client . . . my client wishes to take the stand, and we are going to proceed with the entrapment defense." Hicks then testified. He acknowledged his previous convictions, but stated that he was a changed man who worked multiple jobs to provide for his young son and girlfriend. He testified that Hurd had been pressuring him to get back into selling drugs and that Hurd became increasingly aggressive, telling

Hicks that he "owed some people some money" and
that he was "desperate." According to Hicks, he finally
relented in July 2006 when he agreed to set up the drug
deal for Hurd. Hicks maintained that he did not sell
Hurd any drugs, but instead claimed to have only set up
the exchange between Hurd and an acquaintance.

Hicks's girlfriend, Tanya Lear, also testified on his behalf,
describing his hardworking nature and volunteer efforts.
During Lear's testimony, Juror #9 alerted the court that
she recognized Lear. Outside the presence of the parties,
the juror explained that she had not recognized Lear's
name during voir dire, but that she immediately identified
Lear's voice during her testimony because Lear and the
juror spoke on the phone for work-related issues four to
five times per week. The juror stated that she thought Lear
was "friendly" but that she was able to remain objective.
Nonetheless, the court dismissed the juror for cause and
substituted an alternate juror.

After both parties gave their closing statements, the
district court instructed the jury on the offense charged, on
Hicks's entrapment defense, and on accomplice liability.
The jury found Hicks guilty of distributing more than 50
grams of crack cocaine. Hicks was sentenced to a term
of life imprisonment. He now appeals various aspects of
his conviction and requests a new trial.

## II. ANALYSIS

### A. Juror Properly Dismissed for Cause

A trial judge may exclude for cause any juror who is
"unable to render impartial jury service." 28 U.S.C.

§ 1866(c)(2). "Our review of the trial judge's ruling with respect to a challenge for cause is deferential because the trial judge had the opportunity to assess the credibility and demeanor of the potential jurors during voir dire." *United States v. Brodnicki*, 516 F.3d 570, 574 (7th Cir. 2008). "If the record shows some legitimate basis for the decision to replace a juror, there is no abuse of discretion." *United States v. Warner*, 498 F.3d 666, 689 (7th Cir. 2007) (internal quotation marks and citations omitted).

The district court had a legitimate basis for its dismissal of Juror #9. The juror had informed the court that she communicated with Lear on an almost daily basis as part of their work and that she regarded her as "friendly." We have found that this sort of familiarity is an appropriate basis for dismissal. *See, e.g., United States v. Sandoval*, 241 F.3d 549, 552 (7th Cir. 2001) (during kidnapping trial, district court properly removed juror after juror informed judge that she recognized the witness after seeing him on a previous day). Additionally, Lear was one of Hicks's key witnesses and was testifying about his character, one of the main issues Hicks identified as his defense. Given the importance of Lear's testimony and the extent of her communications with Juror #9, the district court's decision to dismiss her falls well within the range of discretion afforded to trial judges in issues of juror replacement.

**B. Tape Recordings Properly Admitted**

Because Hicks raises a Sixth Amendment challenge to the government's introduction of the recorded conversations, we review the district court's ruling de novo. *See United*

*States v. Nettles*, 476 F.3d 508, 517 (7th Cir. 2007) (reviewing "de novo a ruling that affects a defendant's Sixth Amendment rights"). Hicks argues that the tape recordings of his telephone conversations with Hurd contain hearsay. Rule 802 prohibits the admission of hearsay statements, which are defined as out-of-court statements offered into evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c). We find that the recordings do not contain inadmissible hearsay. It is clear that Hicks's statements were admissible as statements of a party opponent, which do not constitute hearsay. *See* Fed. R. Evid. 801(d)(2) (providing that if a "party's own statement, in either an individual or a representative capacity" is offered against the party, the statement is not hearsay).

Hurd's statements were admissible to contextualize Hicks's statements. "When recorded evidence is admitted in the absence of testimony by an informant who recorded the conversation, the Confrontation Clause of the Sixth Amendment is not violated if the statements are nontestimonial and are not offered for the truth of the matter asserted. It is well-settled that nonhearsay statements are not testimonial if they are offered to provide context." *United States v. Van Sach*, 458 F.3d 694, 701 (7th Cir. 2006). Hurd's statements fit squarely into the "context" exception because, without his part of the conversation, none of the words uttered by Hicks would make sense. Moreover, Hicks never attempted to contradict, clarify, or disavow any of Hurd's statements. We have repeatedly found that the adoption of an informant's statements is also a basis for their admission. *See, e.g., United States v. Schalk*, 515 F.3d 768, 775 (7th Cir. 2008);

*United States v. Woods*, 301 F.3d 556, 561 (7th Cir. 2002) (finding informant's side of telephone conversations with defendant admissible because they were adopted by defendant during the course of the conversation where defendant either led or responded to each of the informant's requests and questions and at no time contradicted the informant's comments or questions regarding the purchase of drugs). Therefore, we find that the district court properly admitted Hurd's statements in the recordings to contextualize Hicks's statements.

## C.  FBI Agents' Testimony Admissible

Hicks contends that the testimony of Agent Jacox and other FBI agents concerning the alleged counter surveillance observed at the August 1 attempted meeting was tantamount to expert testimony. Because Hicks did not raise this objection at trial, we review for plain error. Fed. R. Crim. P. 52(b).

Hicks's argument fails because law enforcement officers are entitled to render lay opinions concerning criminal or suspicious activity based on their personal observations. "A deduction of possible criminality often is warranted when a law-enforcement officer witnesses suspicious behavior personally. Perhaps more often, however, first-hand observation—particularly of a crime like drug-trafficking, which usually is accomplished professionally and furtively—is well-nigh impossible . . . ." *United States v. Skinner*, 972 F.2d 171, 176 n.4 (7th Cir. 1992). Here, the FBI agents did not testify that the persons observed at the restaurant and drugstore were in fact

counter surveillance persons assigned by Hicks; rather, they testified as to their observations—that Jacox was followed from the restaurant to the drugstore, that there appeared to be suspicious individuals watching Jacox, and that they believed it most prudent to call off the operation. Such personal observations do not rise to the level of expert opinion.

## D. Prior Unrelated Drug Convictions Improperly Admitted

Hicks next contends that the district court erred by allowing his prior convictions for cocaine dealing and possession to be admitted during the government's case-in-chief. We review evidentiary rulings made over a defendant's objections for abuse of discretion. *United States v. Avila*, 557 F.3d 809, 819 (7th Cir. 2009). If such an error has occurred, reversal is required if the error affects a defendant's "substantial rights." Fed. R. Crim. P. 52(a). In determining whether a nonconstitutional error affects substantial rights, "our task is to gauge what effect the error had or reasonably may be taken to have had upon the jury's decision." *United States v. Zapata*, 871 F.2d 616, 622 (7th Cir. 1989).

Rule 404(b) provides that evidence of other acts is inadmissible "to prove the character of a person in order to show action in conformity therewith" but may be admissible for other purposes, such as proof of motive, opportunity, intent, plan, knowledge, identity, or absence of mistake or accident. In determining whether evidence was properly admitted under Rule 404(b), the court considers

whether: (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice, as required by Rule 403. *United States v. Harris*, 587 F.3d 861, 864-65 (7th Cir. 2009).

We must first determine whether the convictions are directed toward establishing a matter in issue other than Hicks's propensity to sell drugs. The district court admitted the convictions to establish knowledge and lack of mistake. Whether the prior convictions are relevant to the issue of knowledge or lack of mistake turns on whether they "tend to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." Fed. R. Evid. 401.

As to knowledge, the government contends that Hicks's prior convictions tend to show that Hicks knew about the "illicit nature" of the drug distributing business. But this argument is a non-starter because Hicks never claimed that he did not know that selling crack cocaine was illegal or that he did not know how to sell drugs.

The government also contends, relying on *United States v. Hatchett*, 245 F.3d 625, 643 (7th Cir. 2001), that the convictions were admissible to show that Hicks was a "knowing participant" instead of an "unwitting bystander" to the drug deal. In *Hatchett*, the defendant was charged with distributing crack cocaine to a certain "Riley" and

with aiding and abetting Riley's subsequent distribution of the cocaine to "Panzer" and "Hess." 245 F.3d at 642-43. We found that evidence that the defendant had participated in a prior drug deal was admissible to establish the defendant's knowledge because:

> Although Hatchett insists that his knowledge was actually not in issue, because he simply argued that he did not supply Riley with the cocaine, the record belies his contention. In fact, Hatchett specifically denied having any knowledge that Riley was distributing cocaine to Panzer and Hess. Under these circumstances, we believe that testimony concerning the [previous] transaction— which involved both Riley and Panzer's brother— was admissible . . . .

*Id.*

*Hatchett* is distinguishable from this case. In *Hatchett*, the evidence was relevant to the aiding and abetting charge—to show that the defendant knew that Riley was redistributing the drugs and that the drugs would end up in the hands of Hess and Panzer. *Id.* What was important about the previous drug deal was that the defendant had sold drugs to Riley and had witnessed Riley giving half of the drugs to Panzer's brother. *Id.* at 629. This certainly made it more likely that the defendant knew that Riley was distributing drugs and that he knew all of the players involved. Here, however, Hicks's strategy during the government's case-in-chief was simply to question the agents' ability to witness whether he sold the drugs to Hurd. There was no allegation that Hicks's prior drug

deals involved Hurd. And the government has not explained why Hurd's prior convictions for cocaine possession and distribution make it more likely that he was a "knowing participant" in *this* drug deal other than by drawing the prohibited inference of "once a drug dealer, always a drug dealer."

Neither has the government explained why the convictions were relevant to show that Hicks's actions were the result of a mistake. Hicks never contended that he did not know that the substance for sale was crack cocaine or any other controlled substance. *See United States v. Chavis*, 429 F.3d 662, 673 (7th Cir. 2005) (Cudahy, J., concurring) (describing Rule 404(b)'s exception for absence of mistake as "I thought [the drugs] were cough drops"); *United States v. Webb*, 548 F.3d 547, 548 (7th Cir. 2008) ("As for 'absence of mistake': how does a conviction show this except via the prohibited inference that someone who distributes drugs once is likely to do it again?").

We are also unpersuaded by the government's argument that the prior convictions were admissible to show intent. Because unlawful distribution of cocaine is a general intent crime, in order for the government to introduce prior bad acts to show intent, the defendant must put his intent at issue first. *United States v. Moore*, 425 F.3d 1061, 1069 n.3 (7th Cir. 2005) ("[U]nlawfully distributing cocaine in violation of 21 U.S.C. § 841(a)(1) is a general intent crime."); *United States v. Manganellis*, 864 F.2d 528, 539 (7th Cir. 1988) (evidence of prior bad acts is ordinarily not admissible to prove general intent crimes such as distribution of cocaine); *United States v. Gruttaduro*, 818 F.2d 1323, 1328-29

(7th Cir. 1987) (prior bad acts evidence was inadmissible to prove intent because defendant was charged with a general intent crime and defendant did not directly put his mental state at issue); *United States v. Shackleford*, 738 F.2d 776, 781 (7th Cir. 1984), *modified on other grounds by Huddleson v. United States,* 485 U.S. 681, 685 (1988) ("[W]hen intent is only a formal issue, so that proof of the proscribed act gives rise to an inference of intent, then . . . evidence of other acts directed toward this issue should not be used in the government's case-in-chief and should not be admitted until the defendant raises the issue.").

The government acknowledged as much in its pretrial motions. The government initially sought to introduce the convictions to show intent as well as knowledge and absence of mistake. But it disclaimed that position after the district court found that the convictions could only be used to show knowledge and lack of mistake. The government stated in its response to Hicks's motion for reconsideration:

> In granting the United States' motion, the Court just as clearly articulated that [knowledge and lack of mistake]—and not as a method to prove Defendant Hicks' intent—were the bases upon which the Rule 404(b) evidence could be admitted. . . . [T]he United States has no intention of offering the Rule 404(b) evidence for [the purpose of showing intent].

(emphasis in original).

And Hicks did not put his intent at issue during the government's case-in-chief—he waived his opening statement and his strategy during the first half of the trial

was to undermine the agents' testimony by questioning their ability to tell who gave Hurd the drugs. This case is virtually indistinguishable from *United States v. Manganellis*. 864 F.2d at 529-31. In that case, the defendant was charged with distributing cocaine to an undercover agent and to a friend. *Id*. The defendant denied making the sales and claimed he was mistakenly identified by the agent and that the friend was lying. *Id*. We found that the defendant's claim that he did not commit the alleged acts did not suffice to put his intent at issue and that, as a result, evidence of his prior bad acts involving the sale of drugs on other occasions should not have been admitted into evidence. *Id.* at 539. As in *Manganellis*, finding that Hicks put his intent at issue by merely claiming innocence would "create an exception that would virtually swallow the rule against admission of evidence of prior misconduct" in general intent cases. *See id.* at 532-33*; Shackleford*, 738 F.2d at 781 (finding that defendant charged with general intent crime did not place his intent at issue by maintaining throughout trial that he never committed the acts alleged).

Neither are we persuaded by the government's contention that the convictions were admissible to rebut Hicks's entrapment defense. Evidence of prior convictions is admissible to prove predisposition in an entrapment case, but, again, the government may not introduce propensity evidence unless the defendant places the issue of entrapment into controversy. *Compare United States v. Goodapple*, 958 F.2d 1402, 1407 (7th Cir. 1992) ("When the entrapment defense is clearly raised in the defense's opening statement and the entrapment defense obviously materializes through a defendant's presentation of its own witnesses

or through cross-examination of the government's wit-
nesses, it is not error for the government to present evi-
dence of predisposition in its case-in-chief"), *with United
States v. McGuire*, 808 F.2d 694, 696 (8th Cir. 1987) (finding
that it was error for the district court to allow the govern-
ment to introduce rebuttal evidence in its case-in-chief in
anticipation of an entrapment defense that was proposed
in defense counsel's opening statement but that never
actually materialized).

Although Hicks's counsel discussed the possibility of
raising an entrapment defense prior to trial (after the court
ruled that Hicks's prior convictions were admissible), the
entrapment defense did not materialize until the defense
presented its case. Hicks did not refer to his entrapment
defense during an opening statement, which he waived,
nor during the government's case-in-chief. In fact, it was
not until after the convictions came in at the close of the
government's case-in-chief, over Hicks's renewed objec-
tion, and after the government rested, that Hicks defini-
tively informed the court that he would be raising an
entrapment defense. Had Hicks clearly communicated his
intention to present an entrapment defense before the
convictions were allowed into evidence, the government's
contention that the convictions were admissible to show
predisposition would have more force. But Hicks did not
do so. The proper course of action would have been for
the government to offer the convictions after Hicks's
entrapment defense materialized, either during cross-
examination or during its rebuttal case. Under the circum-
stances presented here, however, we cannot conclude
that Hicks's prior convictions were properly admitted

to rebut his entrapment defense. *See United States v. Pineda-Torres*, 287 F.3d 860, 865-66 (9th Cir. 2002) (defendant's cross-examination of government witness did not open the door to evidence which the district court erroneously determined was admissible before trial because the defendant was simply responding to the district court's pre-trial order); *United States v. Higham*, 98 F.3d 285, 292 (7th Cir. 1996) (finding that prior convictions, which the district court found were not admissible during the government's case-in-chief, should have been allowed into evidence during cross-examination after the defendant presented an entrapment defense because "the landscape had changed").

The government's contention that the convictions were admissible to show accomplice liability suffers from the same defect as its theory that the convictions were admissible to rebut Hicks's entrapment defense. The government did not request an accomplice liability instruction before trial began nor did it ever indicate during its case-in-chief that accomplice liability was an alternative basis for Hicks's guilt. Only after Hicks testified that he had arranged for the drug sale did the government assert an accomplice theory of the case. As with the entrapment defense, Hicks's intent was only placed at issue[1] after the convictions had already been admitted into evidence.

---

[1] *See United States v. Nacotee*, 159 F.3d 1073, 1076 (7th Cir. 1998) ("To be liable under an aiding an abetting theory for the crime itself . . . a defendant must have had the specific intent to aid in the commission of the crime . . . .").

When asked about this during oral argument, the government at one point conceded that intent became an issue only after Hicks testified, but later claimed that "this was always an accomplice case." But if accomplice liability was always the government's theory of the case, it would not have initially disavowed intent as a basis for the admission of the convictions.

In our view, the only apparent relevance of the prior convictions was the very inference that Rule 404(b) prohibits—that is, that Hicks had sold drugs in the past and probably did so this time as well. And the government's opening statement implies that its theory of the case from the outset was propensity. The first words uttered by the government to the jury were:

> When the Defendant was initially arrested in this case in March 2008, he told police that he was a drug dealer. He admitted that he dealt in cocaine, and he admitted that he dealt in ounce quantities of crack cocaine. Ladies and gentlemen of the jury, that is exactly going to be our evidence as to what occurred on July 18, 2006, that the Defendant dealt crack cocaine, ounce quantities of crack cocaine to a confidential informant, who was working at the direction of the DEA.

The government's statement suggests that Hicks's other crimes—i.e., that "he was a drug dealer"—could be a basis for the jury to convict him for the charged offense, despite the fact that sixteen months separated Hicks's statement and the charged conduct. The government has failed to demonstrate that Hicks's prior convictions established knowledge, lack of mistake, or intent. Ac-

cordingly, we find that admitting the prior convictions violated Rule 404(b).

We also find that the Rule 404(b) error affected Hicks's "substantial rights." *See* Fed. R. Crim. P. 52(a). Although the evidence may have been sufficient to convict Hicks, we conclude that an average juror would have found the government's case significantly less persuasive without the prior convictions. *See United States v. Blanchard*, 542 F.3d 1133, 1151 (7th Cir. 2008) (the test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded). Drugs were not explicitly mentioned during the initial conversation between Hicks and Hurd. Instead, the government had to "translate" that conversation for the jury using a "decoder," who testified that Hicks and Hurd were discussing drugs—a conclusion the jury may not have reached on its own and could have discredited. There was also no direct evidence that Hicks himself sold the crack cocaine to Hurd. While Hicks's discussion with Hurd about prices when the two were in the house suggests that Hicks could have sold Hurd the drugs, no one witnessed the drug deal and it is possible that one of the other people whose voices were picked up by the recording gave Hurd the cocaine. Lastly, Hicks's statement to the police sixteen months after the charged deal to the effect that he had engaged in other drug deals was not an acknowledgment of responsibility for *this* deal. *See United States v. Simpson*, 479 F.3d 492, 501-02 (7th Cir. 2007), *abrogated in part on other grounds by United States v. Boone*, 628 F.3d 927, 933 (7th Cir. 2010) (defendant's admission that he

had engaged in similar drug deals in the past and had been dealing drugs for several years making "possible" his responsibility for the drug deal charged was not tantamount to an acknowledgment of responsibility for the charged deal and was admitted in violation of Rule 404(b)). Without the propensity evidence, an "average" juror may very well have concluded that the government did not prove beyond a reasonable doubt that Hicks supplied Hurd with crack cocaine. "Allowing a prosecutor routinely to introduce drug convictions in the case in chief without demonstrating relevance to some concrete dispute between the litigants creates needless risk that a conviction will rest on the forbidden propensity inference." *United States v. Jones*, 455 F.3d 800, 812 (7th Cir. 2006) (Easterbrook, J., concurring). Given the lack of direct evidence and the relative weakness of the government's circumstantial case, we find that the admission of the convictions affected Hicks's substantial rights, and we therefore reverse.[2]

### III. CONCLUSION

The defendant's conviction is VACATED, and the case is REMANDED to the district court for a new trial.

---

[2] Because the Rule 404(b) grounds are sufficient for reversal, we do not reach Hicks's final argument concerning the jury instructions.