In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3001

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARLES C. CHRISTIAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:10-CR-30239-001—**G. Patrick Murphy**, *Judge.*

ARGUED JANUARY 12, 2012—DECIDED MARCH 12, 2012

Before EASTERBROOK, *Chief Judge*, and ROVNER and
TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* After a two-day jury trial, defen-
dant Charles C. Christian was found guilty of felon in
possession of a firearm, 18 U.S.C. § 922(g)(1), user in
possession of a firearm, § 922(g)(3), and possession
of marijuana and cocaine base, 21 U.S.C. § 844(a). The
defendant appeals only his conviction on the gun
counts. He argues that the trial court committed

reversible error by permitting FBI Special Agent Nicholas Manns and Illinois State Police Trooper Matt Renner, officers who apprehended the defendant for the charged conduct, to testify as both expert and fact witnesses without taking precautions to separate and distinguish for the jury the dual nature of their testimony. We have previously explained that dual role testimony can be confusing to a jury but is permissible provided the district court take proper precautions to minimize potential prejudice. Because Trooper Renner's challenged testimony did not rise to the level of expert opinion, we find no duality concerns with his examination. Not so with Agent Manns; he testified in a dual capacity, giving rise to the concern that his expert testimony improperly bolstered his fact testimony.

Christian, however, never raised a duality objection at trial, so we review for plain error, and because some precautions were taken to alleviate jury confusion, we cannot conclude that the district court committed such an error. The government laid a proper foundation for Agent Manns' expert testimony; Christian had the opportunity to fully cross-examine Agent Manns in this capacity; most of the government's questions eliciting expert testimony signaled to the jury that Agent Manns was relying on his expertise; and at the conclusion of the trial, the district court gave the standard jury instruction for opinion testimony requiring special knowledge or skill, informing the jurors that they could disregard the testimony and give it whatever weight they thought it deserved. Although further precautions could have been taken to separate Agent Manns' fact from expert

testimony, the failure to take those additional precautions does not result in reversible error.

## I. Facts

The charges (and ultimate conviction) in this case stem from Christian's arrest late one evening in November 2010 by Agent Manns and Trooper Renner. They were patrolling Brooklyn, Illinois, a high-crime area, when they noticed a car with temporary tags. The car was traveling slowly and the driver had his signal on through one intersection before turning at the next. The officers did not follow the vehicle, but shortly after, spotted it again, this time parked on the side of the road near a field. The driver, Christian, was outside the car on the passenger side, at the edge of the field. The officers thought he was either sick or urinating and wanted to check it out, so they pulled up at an angle to the rear of the driver's side and turned on their emergency lights. They got out of their car and Christian, who was facing the weeds with his back to them, turned toward the officers with a surprised look. The officers could only see Christian's upper body; his lower half was obstructed by his vehicle. Agent Manns testified that Christian immediately turned away, made a furtive movement with his arms, jumped into his vehicle, and took off, triggering a high-speed car chase. Christian eventually exited his vehicle and continued to flee on foot. The officers were a little swifter and quickly apprehended him.

Agent Manns searched Christian; he found marijuana, but no weapons. Trooper Renner (along with other

officers who had arrived on the scene) searched Christian's car and found more marijuana. Agent Manns went back to the field where he had first approached Christian and found a loaded handgun (which forms the basis for the gun counts) near what he believed to be Christian's tire track and near the spot where Christian paused before fleeing. Twelve minutes elapsed between the time the officers first approached Christian and discovery of the gun. No fingerprints were found on the gun or bullets. Trooper Renner walked the route where Christian fled on foot and found a plastic bag of crack cocaine.

During trial, Agent Manns testified to his extensive experience and special expertise as a federal agent (first as a deputy U.S. marshal, then as an FBI agent). He has 20 years of experience as a federal agent and has received specialized training on "street survival officer safety" and tactical use of weapons. The defendant objected, stating that the narrative of the officer's background wasn't relevant. The district court overruled the objection, stating, "I don't know for what purpose the witness is being qualified as an expert witness, but it seems as if that's the point. . . ." Agent Manns proceeded to testify that he has made over 600 felony arrests during his tenure with the FBI. When asked on how many occasions he had encountered an armed individual, the defendant posed a continuing objection to this line of questioning. The district court asked the prosecutor, "Are you going to elicit opinions that require expert opinion?"; the prosecutor responded, "I think the agent's expertise is relevant to the level of attentiveness

and how he would approach any situation." The court overruled the defendant's objection. Agent Manns answered that he has encountered individuals armed with a handgun on their person about a hundred times and has been involved in several law enforcement shootings.

Agent Manns testified that when officers approach individuals that might be dangerous or in a high-crime area, they are trained to watch the individual's hands. Agent Manns testified that "as [Christian] came from out behind the car, over the hood of the car, I could see that he was concealing his hands from me." He explained that Christian's hands were "hidden down around his waistband," and that this prompted him to tell Trooper Renner to "watch him," because he was worried the defendant "might be armed." The government asked "what had transpired in those few split seconds . . . to make you now think there's a possibility that the subject is armed"; Agent Manns responded, "The fact that he was concealing his hands from my view. In my experience, that's what it is indicative of."

Christian took another step or two to the front passenger side of his car, paused, and made another movement with his hands that Agent Manns described as "consistent with pulling a gun." Christian then turned and ran around the front of his vehicle and Agent Manns could see at that point that his hands were empty. After arresting Christian, Agent Manns went back to the field where he had approached Christian because he "believed there was a weapon there," and when he found the handgun, "believe[d] that to be the defendant's . . . firearm."

Still on direct examination, the prosecutor asked Agent Manns, "in light of your experience, both as a deputy marshal and as an FBI Agent patrolling the Metro East area, specifically on violent crime initiative-type details, is it commonplace to find firearms laying in plain view on the streets?" The defendant objected, stating that the government was attempting to elicit an opinion as to the ultimate issue before the trier of fact. The district court overruled the objection, explaining, "the witness is not asked to give an opinion as to guilt or innocence. He's asking something based upon his experience as an investigating officer . . . and I will let him give an opinion on that." Agent Manns responded that "[i]n my 20 years of law enforcement, I have never found a firearm laying on the streets or in a field unattended, for that matter, nor has anyone that I've worked with, that they've relayed to me. . . . [W]e never find firearms where a person is not in close proximity or a person had fled, etc., where we can associate it with an individual or group of individuals."

Defense counsel then cross-examined Agent Manns, asking him if he could tell whether Christian was simply trying to zip up his pants. Agent Manns responded that Christian was concealing his hands and his actions were not consistent with zipping up his pants. He testified that he thought Christian was armed based on his movements. Defense counsel, however, elicited testimony that neither the gun, nor the bullets, had Christian's fingerprints, that the gun was found in a high-crime area, and that Agent Manns never saw Christian with the gun or told him to put his hands up.

On redirect, the government asked Agent Manns, "In your experience as a police officer over the last . . . 20 years . . ., [h]ow do people that illegally carry weapons on their persons tend to conceal them?" Agent Manns answered that about 90 percent of people conceal them in their waistband or coat pocket. Agent Manns then got off the stand and demonstrated Christian's movements (focusing on his arm motions) and indicated the location of the gun in relation to where Christian had been standing. Agent Manns explained that he saw Christian's arms move in a way consistent with both elbows coming up and one hand moving, and the prosecution asked, "Based upon your experience encountering armed subjects in your approximate 20-year career, the significance of those arms going up and not being able to see the hands, was what?" The defendant objected as eliciting "an opinion on the ultimate issue." The court responded, "On those grounds, overruled." Agent Manns answered, "That is a movement I have seen before in my career on occasions wherein the defendant had a gun in his waistband. It was the same movement. That's what I saw, that's why I told—that's why I stopped. And Trooper Renner, I wanted him to stop too." On recross, Agent Manns explained that "[i]t was not an opinion that [Christian] had a gun, it was my belief he did."

Trooper Renner also testified to his experience: he has had five years of law enforcement experience and his training has included specialized courses on street survival and detecting hidden weapons. Trooper Renner testified that "[d]uring the hidden weapons training, they basically show us the types of weapons that may be

hidden, the different places that they may be hidden, and to . . . be aware of those things." Trooper Renner then explained that when patrolling a high-crime area, "Rule Number 1, . . . is to watch somebody's hands." Trooper Renner also never saw Christian with a gun, but similar to Agent Manns, testified that as soon as Christian saw him, "he turned around and concealed his hands." The defendant did not object to Trooper Renner's testimony.

Two other witnesses testified at trial. Daniel Owens, Special Agent with the Bureau of Alcohol Tobacco & Firearms (ATF), testified as an expert witness on the interstate nexus of the firearm and to the fingerprint analysis. Joseph Beliveau, Illinois State Police Officer, testified as an expert witness on the value of drugs found. He also testified that he has never found a firearm just laying around. He said, "We'll occasionally find firearms tucked away in positions around people. But in that type of a neighborhood, that firearm would not last there very long if it was laying in the street." The defendant did not object to this testimony.

At the conclusion of trial, the district court gave Seventh Circuit Pattern Jury Instruction 3.07 on expert testimony:

> You have heard witnesses give opinions about matters requiring special knowledge or skill. You should judge this testimony in the same way that you judge the testimony of any other witness. The fact that such a person has given an opinion does not mean that you are required to accept it. Give the testimony whatever weight you think it deserves,

considering the reasons given for the opinion, the witness' qualifications, and all other evidence in the case.

(Trial Tr. p. 161). The defendant did not object to the instructions or propose any other cautionary or limiting instructions, either as part of the final instructions or at any earlier part of the trial.

## II. Analysis

Normally, we review a district court's evidentiary rulings for an abuse of discretion, but when a proper objection is not made, review is for plain error. *United States v. Phillips*, 596 F.3d 414, 416 (7th Cir. 2010); *see also United States v. Ambrose*, ___ F.3d ___, No. 09-3832, 2012 WL 506741 at *17 (7th Cir. Feb. 16, 2012). The defendant in this case did not object to Trooper Renner's testimony, so our review of his testimony is for plain error. Although the defendant objected several times to Agent Manns' testimony, he never objected to Agent Manns' qualifications to testify as an expert or the dual nature of his testimony. "To preserve an evidentiary error for appellate review, the objecting party must state the specific basis for the objection[;]" if the basis for the objection changes on appeal, we review for plain error. *United States v. Gaytan,* 649 F.3d 573, 579 n.1 (7th Cir. 2011), *cert. denied*, 132 S. Ct. 1129 (2012). Accordingly, because defendant's objections at trial and on appeal are "substantially different," we limit our review to plain error. *United States v. DiSantis*, 565 F.3d 354, 362 (7th Cir. 2009); *see*

*also United States v. Price*, 418 F.3d 771, 779 (7th Cir. 2005). Similarly, plain error review applies where, as in this case, the defendant never requested a cautionary instruction or otherwise objected to the instructions given. *See United States v. Breland*, 356 F.3d 787, 792 (7th Cir. 2004). When an appellant alleges cumulative error, we will only consider plain errors and errors that were preserved for appellate review. *See United States v. Nunez*, 532 F.3d 645, 655 (7th Cir. 2008).

Under the plain error standard, we must determine whether there was (1) an error, (2) that was plain, meaning clear or obvious, (3) that affected the defendant's substantial rights in that he probably would not have been convicted absent the error, and (4) that seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Ambrose*, 2012 WL 506741 at \*17; *see also United States v. Baker*, 655 F.3d 677, 681 (7th Cir. 2011). An error is "plain," when it is so obvious "that the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *United States v. Turner*, 651 F.3d 743, 748 (7th Cir.) (quotation omitted), *cert. denied*, 132 S. Ct. 863 (2011). "It cannot be subtle, arcane, debatable, or factually complicated. It must be—plain; but it needn't be blatant." *Id.* (quotation omitted). Even if plain error occurs and affects the defendant's substantial rights, the defendant must also show that the error caused a "miscarriage of justice, in the sense of seriously affecting the fairness, integrity, or public reputation of judicial proceedings." *United States v. Orr*, 622 F.3d 864, 868 (7th Cir. 2010) (quotation omitted), *cert. denied*, 131 S. Ct.

2889 (2011); *see also United States v. Vincent*, 416 F.3d 593, 603 (7th Cir. 2005).

We do not find that the district court committed plain error, and even if it had, we do not find that such an error affected the defendant's substantial rights or constituted a miscarriage of justice.

## A. Expert Versus Lay Opinion Testimony

We first address whether Agent Manns and Trooper Renner even provided expert testimony; if not, we have no dual testimony concerns. Rule 701 of the Federal Rules of Evidence provides that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determine a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

A witness can qualify as both a fact and expert witness and an expert may base an opinion on fact or data in the case that the expert has personally observed. Fed. R. Evid. 703. Thus, the Rules do "not distinguish between expert and lay *witnesses*, but rather between expert and lay testimony." Fed. R. Evid. 701 advisory committee's note (2000 amends.). "[L]ay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *Id.* (quotations omitted). We have explained that "[a] law-enforcement officer's testimony is a lay opinion if it is 'limited to what he observed . . . or to other facts derived exclusively from [a] particular investigation.'" *Gaytan*, 649 F.3d at 581 (quoting *United States v. Oriedo*, 498 F.3d 593, 603 (7th Cir. 2007)). "On the other hand, an officer testifies as an expert when he brings 'the wealth of his experience as [an] officer to bear on those observations and ma[kes] connections for the jury based on that specialized knowledge.'" *Id.; see also United States v. Fenzl*, ___ F.3d ___, No. 11-2459, 2012 WL 576432 at *4 (7th Cir. Feb. 23, 2012).

However, the distinction between expert and lay testimony is often far from clear in cases where, as here, "a witness with specialized . . . knowledge was also personally involved in the factual underpinnings of the case." *United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007). The inferences officers draw when observing and responding to situations cannot always be separated from the expertise they bring to evaluate those situations. Their observations are guided by experience

and training and thus, at least some of their fact testimony will be influenced by this specialized knowledge.

Agent Manns' and Trooper Renner's testimony that they are trained to watch individuals' hands when approaching a situation was not expert testimony. Nor was the officers' testimony that Christian's concealment of his hands raised a red flag. The witnesses were not offering opinions, they were simply informing the jury of their state of mind while observing Christian; the testimony informed the jury of their attentiveness and cautiousness in approaching the situation. *See Oriedo*, 498 F.3d at 602 (indicating that an agent can testify to *his* state of mind while observing a drug deal even if the testimony is informed by the agent's specialized training). We found similar observations admissible as lay testimony in *Oriedo*, where the agent stated that he was personally concerned about the presence of more than one vehicle at the controlled buy because it raised concerns of "countersurveillance*." Id.* We have likewise found that "officers are entitled to render lay opinions concerning criminal or suspicious activity based on their personal observations." *United States v. Hicks*, 635 F.3d 1063, 1069 (7th Cir. 2011); *see also Hicks*, 635 F.3d at 1066, 1069 (officer's testimony that FBI called off operation because of suspicious behavior associated with countersurveillance was proper lay opinion). Because Trooper Renner's testimony to which the defendant has objected was not given in the form of expert testimony, we have no reason to discuss his testimony further.

Agent Manns, by contrast, was asked questions that suggest he was also testifying in an expert capacity. The government qualified Agent Manns as an expert (the district court acknowledged as much) and the defendant concedes that Agent Manns was properly disclosed as an expert pursuant to Rule 16 of the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 16(a)(1)(G). Agent Manns' blended expert and fact testimony is best illustrated by his testimony on redirect. He first testified that 90 percent of people who illegally carry weapons conceal them in their waistband or coat pocket. The government then asked Agent Manns to stand in front of the jury to demonstrate Christian's arm movements. Although Agent Manns was testifying as a fact witness—he was simply describing what he had observed—the next question crossed the line into eliciting testimony wrapped in the aura of special reliability that surrounds expert testimony: "Based upon your experience encountering armed subjects in your approximate 20-year career, the significance of those arms going up and not being able to see the hands, was what?" Agent Manns answered, "That is a movement I have seen before in my career on occasions wherein the defendant had a gun in his waistband. It was the same movement. . . ." Agent Manns had earlier testified on direct that in light of his 20 years of law enforcement experience, he had never found a firearm laying in a field unattended, supporting his belief that the gun found belonged to Christian.

When eliciting this testimony, the government wasn't merely seeking lay opinion testimony; the government was asking Agent Manns to bring his experience to bear

on his personal observations and "ma[k]e connections for the jury based on that specialized knowledge." *Oriedo*, 498 F.3d at 603 (holding that different agent in *Oriedo,* who had found plastic baggies with the corners cut in defendant's hotel room, testified in expert capacity when informing the jury that this is how crack cocaine is packaged for distribution); *see also Tribble v. Evangelides*, ___ F.3d ___, 2012 WL 245029 at *3 (7th Cir. Jan. 26, 2012) (explaining that witness, who summarized her experiences and used her specialized knowledge to guide the jury to a conclusion, testified in an expert capacity); *United States v. York*, 572 F.3d 415, 420 (7th Cir. 2009) (interpreting drug jargon requires expert testimony where the witness is relying on his prior experience in drug investigations to explain the hidden meaning of words).

Christian contends on appeal that Agent Manns' expert testimony was not helpful in assisting the jury because a layperson needs no expert assistance to understand how one would have to move his arms to pull something out of his waistband.[1] Expert testimony

---

[1] Christian also argues for the first time on appeal that Agent Manns was not adequately qualified as having specialized knowledge to give an opinion as to his arm movements. The defendant did not raise any specific objections to Agent Manns' qualifications, methods, or reliability before the district court. When neither party specifically asks the district court to engage in this analysis under Rule 702, the district court is not required to do so and does not err in admitting the testimony. *See United States v. Moore*, 521 F.3d 681, 685 (7th Cir. 2008); *see*

(continued...)

must be helpful to the jury to be admissible. *United States v. Winbush*, 580 F.3d 503, 510-11 (7th Cir. 2009) (citing Fed. R. Evid. 702). In other words, a witness should not be allowed to put an "expert gloss" on a conclusion that the jurors should draw themselves. *See York*, 572 F.3d at 423 ("'Interpretations' of unambiguous words or phrases that are plainly within the jury's understanding are unlikely to be admissible under Rule 702.") (quotations omitted). "[E]xpert testimony does not assist where the jury has no need for an opinion because it easily can be derived from common sense, common experience, the jury's own perceptions, or simple logic." 29 Charles Alan Wright & Victor James Gold, *Federal Practice & Procedure* § 6264 (1997); *see also Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 602-03 (7th Cir. 2011).

Although at first glance, Agent Manns' expert testimony that Christian's arm movements were consistent with tossing an object may appear to be a matter of common sense, a more deliberate consideration of the testimony suggests otherwise. What might seem like innocuous

---

[1] (...continued)

*also United States v. Farmer*, 543 F.3d 363, 370 (7th Cir. 2008) (stating that even though the defendant appealed under Rule 702, neither the defendant nor the government specifically requested that the district court evaluate the agent's qualifications as an expert, and thus, "the district court did not err by not inquiring further into [the agent's] qualifications."). We nevertheless address Christian's related and more pertinent, inquiry—whether Agent Manns' testimony couched in terms of expertise was helpful to the jury.

conduct to an untrained jury, might, to the trained eye, be indicative of criminal activity. *See Winbush*, 580 F.3d at 511; *compare York*, 572 F.3d at 423 (finding that law enforcement officers' explanation of drug jargon and code words that might seem entirely innocuous to an untrained jury is proper expert testimony), *with United States v. Cruz*, 363 F.3d 187, 196-97 (2d Cir. 2004) (agent gave impermissible expert opinion on phrase, "to watch someone's back"; phrase was ambiguous and outside ambit of agent's "drug jargon" expertise). For example, in *United States v. Parra*, 402 F.3d 752, 759 (7th Cir. 2005), we allowed expert testimony of seemingly innocent-looking conduct consistent with drug trafficking counter-surveillance. The agent in *Parra* testified that the defendant was "looking up and down the street around and then looking back towards [the suspected drug car]," and explained "why, in his expert opinion, this seemingly innocuous conduct indicated that the defendant was engaged in counter-surveillance." *Id.* We allowed the expert testimony even though the jury had access to the surveillance tapes. *Id.*

Jurors are presumably not well versed in the concealment or disposal of weapons. Agent Manns had specialized training on street survival and officer safety, had significant experience encountering armed suspects, and on a few occasions observed similar arm movements when individuals were concealing guns in their waistband. As such, to his trained eye, Christian's arm movements had characteristics of illicit conduct inconsistent with someone merely zipping up his pants. Recognizing the fine distinction in arm move-

ments from a posterior view to distinguish between tossing something from one's waistband and zipping up one's pants is within the ambit of Agent Manns' expertise and not necessarily a matter of common experience. *See Florek,* 649 F.3d at 602 ("[E]xpert testimony is more likely to satisfy [Rule] 702's requirement that it "assist the trier of fact to understand the evidence or determine a fact in issue" when something peculiar about law enforcement (e.g., . . . the circumstances they face) informs the issues to be decided.").

But even if it was error to allow Agent Manns to put an expert gloss on this testimony, and even assuming that the error was preserved by defendant's non-specific objections, we find any such error harmless. "The third prong of the plain error test—whether the error affected the defendant's substantial rights—calls for essentially the same inquiry as a harmless error analysis." *United States v. Halliday*, ___ F.3d ___, No. 10-2337, 2012 WL 447450 at *5 (7th Cir. Feb. 14, 2012) (quotations omitted). "An error is harmless if the reviewing court is convinced that the jury would have convicted even absent the error." *United States v. Simmons*, 599 F.3d 777, 780 (7th Cir. 2010).

We have already found that it was proper for Agent Manns and Trooper Renner to testify as fact witnesses that Christian was concealing his hands and that this raised a red flag. Christian does not dispute that Agent Manns could have testified as a fact witness that it appeared Christian threw something from his waistband. He could also testify (as he did) that in his experience people who illegally carry weapons conceal them in

their waistband. Further, Agent Manns found a gun near where Christian had paused before fleeing, and both Agent Manns and Officer Beliveau (whose testimony defendant lodges no objections) informed the jury that in their experience it is not common to find firearms laying around. (The permissibility of Agent Manns' dual nature testimony is discussed below).

The defense had the opportunity to cross-examine Agent Manns on these issues and did so. The defense inquired with Agent Manns about whether what he saw could have been Christian zipping up his pants. The defense also had Agent Manns and Trooper Renner reiterate that neither actually saw Christian with a gun. On redirect, Agent Manns demonstrated for the jury Christian's arm movements; the jury was free to disregard Agent Manns' characterization of the movements and evaluate for itself the significance of Christian's conduct. The district court instructed the jury that it should give opinion testimony requiring special knowledge or skill "whatever weight you think it deserves," and "should judge this testimony in the same way that you judge the testimony of any other witness." *See* Federal Criminal Pattern Jury Instructions of the Seventh Circuit 3.07. Further, Agent Manns informed the jury during recross that it was not his opinion that Christian had a gun, it was his belief that he did. Based on a review of the record, we do not find that allowing Agent Manns to testify to the import of Christian's arm movements under the umbrella of expertise constitutes reversible error.

## B.  Dual Testimony

Christian also contends that the district court erred by not demarcating between Agent Manns' expert and fact testimony, resulting in an unfair bolstering of Agent Manns' fact testimony. (Although Christian raised similar duality concerns as to Trooper Renner's testimony, as previously noted, he has not identified any part of Trooper Renner's testimony that qualifies as expert testimony.) We have stated on numerous occasions that when a witness, such as Agent Manns, testifies in a dual capacity, the district court must take precautions to minimize prejudice to the defendant. *See York*, 572 F.3d at 425; *see also United States v. Farmer*, 543 F.3d 363, 370 (7th Cir. 2008). The witness's dual role might confuse the jury, *United States v. Goodwin*, 469 F.3d 636, 641 (7th Cir. 2007), or a jury might "be smitten by an expert's 'aura of special reliability' and therefore give his factual testimony undue weight," *York*, 572 F.3d at 425; *see also United States v. Upton*, 512 F.3d 394, 401 (7th Cir. 2008) ("Experts famously possess an 'aura of special reliability' surrounding their testimony. And it is possible that the glow from this halo may extend to an expert witness's fact testimony as well, swaying the jury by virtue of his perceived expertise rather than the logical force of his testimony." (internal citation omitted)). "Or, the jury may unduly credit the opinion testimony of an investigating officer based on a perception that the expert was privy to facts about the defendant not presented at trial." *York*, 572 F.3d at 425 (quotations omitted). Alternatively, "the mixture of fact and expert testimony could, under some circumstances, come close to

an expert commenting on the ultimate issue in a criminal matter." *Upton*, 512 F.3d at 401 (citing Fed. R. Evid. 704(b)).

In light of such dangers, "district courts must take some precautions to ensure the jury understands its function in evaluating this evidence. The jury needs to know when an agent is testifying as an expert and when he is testifying as a fact witness." *York*, 572 F.3d at 425 (internal citations omitted). The "dual testimony" situation "places an especially heavy burden on the district court to ensure that the jury understood its function in evaluating the evidence," particularly where the conduct at question may appear innocent. *Parra*, 402 F.3d at 759 (quotation omitted). To take the necessary precautions, the court can give an appropriate cautionary instruction and require examination of the witness in such a way as to make clear when the witness is testifying to fact and when he is offering his opinion as an expert. *York*, 572 F.3d at 425; *see also Farmer*, 543 F.3d at 370. Other precautions include the government establishing the proper foundation for the witness's expert opinions and the district court allowing rigorous cross-examination. *York*, 572 F.3d at 425.

In *York*, the defendant argued that an officer impermissibly testified as both an expert and fact witness in the same trip to the witness stand. *Id.* The government established an adequate foundation for the witness's testimony and the court put no limits on the defense's cross-examination, but we noted that the district court and the government were less vigilant

in instructing the jury and structuring the witness's testimony. *Id.* at 425-26. The court, as in this case, instructed the jury at the end of the trial how it should evaluate expert opinion testimony, but we noted that "[i]t would have been far more effective for the court to have explained [the witness's] dual role to the jury before [the witness] testified and then flag for the jury when [the witness] testified as a fact witness and when he testified as an expert." *Id.* at 426; *see also Upton*, 512 F.3d at 401 (cautionary instruction given *before* the witness testified and twenty-minute break given between the two types of testimony).

We were even more concerned in *York* with the structure of the witness's testimony. 572 F.3d at 426. We noted that the government at times signaled to the jury that the witness was relying on his expertise when answering questions prefaced with phrases like, "based on your experience in crack cocaine investigations . . .," which helped minimize jury confusion. *Id.* But the government would switch back to questioning the witness about the investigation, and then after several moments into the witness's factual testimony, question him as an expert. We explained that "[s]eamlessly switching back-and-forth between expert and fact testimony does little to stem the risks associated with dual-role witnesses." *Id.* Other questions explicitly mixed the witness's dual basis of knowledge, leaving the jury to wonder whether the expert or case agent was testifying. We concluded that "[g]iven, this heightened possibility for jury confusion, coupled with the lack of a timely cautionary instruction and the fact that we cannot

discern whether [the witness's] interpretations were actually based on his expertise or a conversation with [the informant]," the court erred (albeit harmlessly) in admitting the testimony. *Id.*

In *Farmer*, 543 F.3d at 369, an agent also testified as a fact witness regarding the investigations' progress and events and as an expert witness to assist the jury in understanding the coded drug language contained in recorded conversations. Unlike in *York*, however, we found sufficient precautions taken where the district court required the government to establish the proper foundation for the agent's knowledge and the government prefaced the expert testimony by asking the agent the meaning of the coded language "based on his expertise" (the government, however, did not preface each question that elicited the agent's expert opinion in this way). *Id.* at 371 & n.2. We also noted that the court "gave the appropriate cautionary instruction regarding expert testimony, instructing the jury that it could judge that testimony the same way it judges fact witnesses' testimony, and could '[g]ive the testimony whatever weight you think it deserves . . . .'" *Id.* at 371. (Based on our review of the record in *Farmer*, it appears that this instruction was given after the close of the evidence.) We further reasoned that the district court allowed the defense to extensively cross-examine the agent about the coded drug terms, his familiarity with other drug terms, and the factual aspects of his testimony. *Id.*

We concluded in *Farmer* that "[i]n light of these safeguards, any risk that the jury could have confused [the agent's] direct observations with his expert knowledge

of the code words was adequately alleviated." *Id.*; *see also Parra*, 402 F.3d at 759-60 (sufficient precautions taken where agent was qualified as an expert, jury was given a cautionary instruction, and defense counsel engaged in rigorous cross-examination of agent regarding his expertise and substance of testimony).

Our case has similarities to both *York* and *Farmer*. As in *Farmer*, at the close of the evidence, the district court gave the standard cautionary instruction for opinion testimony requiring special knowledge or skill. Further, many of the questions eliciting Agent Manns' expert testimony were prefaced with phrases akin to "in your experience," signaling to the jury when he was relying on his expertise and minimizing confusion over his dual role. The government also properly qualified Agent Manns as an expert and the defendant was not limited in his cross-examination. As in *York*, though, the district court did not explain Agent Manns' dual roles to the jury, there was significant blending between his fact and expert witness testimony, and the cautionary instruction was not given when he testified nor was it specific to dual testimony.

We are presented with a borderline case. In *United States v. Baptiste*, 596 F.3d 214, 225 (4th Cir. 2010), the court found no plain error where the case fell in the gray area. In that case, the district court did not issue a cautionary instruction specific to the witness's dual role and the government's questioning did not separate lay and expert testimony. The district court however ensured that the government laid the foundation for

the witness's expert testimony, instructed the jury that "it's for you to accept, reject or whatever in terms of whether you accept that testimony or not," and noted that defense counsel could challenge the witness's opinions. *Id.* Based on such facts, the court could not find that the district court committed an obvious or clear error. *Id.*

As in *Baptiste*, we do not find plain error. Further, given that the safeguards taken (although they could have been better) helped alleviate the risk of jury confusion, we do not find a miscarriage of justice in the blending of dual testimony. But we would be remiss not to remind district courts that additional steps should be taken to ensure that there is a clearer demarcation when an agent testifies in a dual capacity. Even more importantly, prosecutors should be alert to situations where dual testimony is likely and provide adequate forewarning as well as structure to their examinations so the court can assist jurors in recognizing the difference between fact and expert testimony.

### III. Conclusion

For the foregoing reasons, finding no plain error, harm to substantial rights, or miscarriage of justice, we AFFIRM Christian's conviction.